975 A.2d 377

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
ANTHONY BOGAN, DEFENDANT-RESPONDENT.

Argued January 6, 2009—Decided July 7, 2009.

*Hillary K. Horton,* Deputy Attorney General, argued the cause for appellant (*Anne Milgram,* Attorney General of New Jersey,

attorney; *Ms. Horton* and *Joie D. Piderit,* Deputy Attorney General, of counsel and on the briefs).

*Linda Mehling,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice ALBIN delivered the opinion of the Court.

Under the pretext of offering a fourteen-year-old female student a car ride to school, defendant Anthony Bogan instead took her to an apartment where he sexually molested her. That same morning, the student reported the crime to the police and gave a description of defendant and the precise location of the apartment. When the police proceeded to the apartment, a nervous, young boy in pajamas opened the door and gave inconsistent responses to simple questions. When the boy answered the telephone inside the apartment, he handed the receiver to one of the officers to speak with his parent. The officer, who stepped inside the apartment to take the call, then saw defendant—who fit the description of the alleged molester—lying on a bunk bed. On-site officers entered the apartment and arrested defendant, who afterwards made incriminating statements.

The trial court denied defendant's motion to suppress the statements he made to the police, finding that the entry into the apartment was justified by the exigent circumstances and community caretaking exceptions to the warrant requirement of the federal and state constitutions. Disagreeing with the trial court, the Appellate Division suppressed defendant's inculpatory statements. It concluded that the police, armed with probable cause, approached the apartment for the purpose of conducting an investigation, and should have secured a search warrant before entering the premises.

We now reverse the Appellate Division and determine that the police officer's entry into the apartment to take the telephone from an unattended child to speak with his parent was justified by the community caretaking doctrine. The officer did not need a search warrant to speak with the parent of a child, who inexplica-

bly was not in school and was purportedly alone in an apartment where a suspected crime had occurred. Under the circumstances, the police had a community caretaking duty to identify a responsible adult for the young boy and an immediate duty to ensure his safety. Because the officer was lawfully on the premises when he observed defendant in plain view, the police had a right to question defendant. Accordingly, the statements made by defendant to the police were properly admitted at trial.

## I.

### A.

Sometime between 9:30 a.m. and 10:00 a.m. on May 27, 2004, a receptionist at the Passaic Mill Work on Central Avenue in the City of Passaic noticed a young girl outside on the sidewalk, crying hysterically and pacing back and forth. The receptionist invited the fourteen-year-old girl, whose name was Kathleen, inside and offered her water.[1] After learning that a person who was supposed to drive Kathleen to school had molested her, the receptionist called the Passaic Police Department.

A Passaic police sergeant first arrived on the scene. However, once it was determined that Kathleen claimed to have been sexually molested in a City of Clifton residence, Clifton police officers arrived shortly thereafter. Kathleen informed the officers that, while walking to school that morning, she was offered a ride by a male family friend who she knew by the name of "Bog"— later identified as defendant.[2] Instead of taking her to school, defendant drove Kathleen in a gray car to 111 Russell Street in Clifton, where he lured her into a second-floor apartment. Inside,

---

[1] With the exception of defendant, pseudonyms are used for the names of the laypersons mentioned in this opinion.

[2] The facts presented here come mainly from Clifton Police Officer Stephen Berge, the only witness to testify at an *N.J.R.E.* 104 hearing to determine the legality of the "search" and the voluntariness of defendant's statements to the police.

defendant sexually molested Kathleen, touching her breasts and vaginal area over her clothing.

Kathleen described defendant as an African–American male, between twenty- and thirty-years old, approximately five foot, ten inches in height, and wearing a white t-shirt, dark blue jeans, and black sneakers. She also told the police that while she was inside the apartment, a young boy named Wally was there. Accompanied by Kathleen, three Clifton police officers—Officers Berge and Guerrero and Sergeant Dennis—proceeded to 111 Russell Street, which was a short distance away.

On their arrival, they found parked in front of the Russell Street address a gray 1991 Audi, which Kathleen identified as the car driven by defendant. A check of the license plate revealed that the vehicle was registered to Delilah Vance, of 111 Russell Street. After Kathleen was escorted around the corner, the officers rang the bell to the second-floor apartment. In response, the officers heard an adult-sounding male voice yell from inside the apartment, "Who is it?" The officers replied, "Clifton Police."

A few moments later, Wally Vance—an approximately twelve-year-old boy wearing pajamas—opened the door. The officers followed Wally up the stairs toward the second-floor apartment, asking him if he was home alone. Wally answered, " 'no, nobody's at home' " but "he seemed a little nervous." That answer struck the officers as inconsistent with the adult male voice they heard earlier coming from the apartment. At the top of the stairs, with Wally inside the apartment and the officers on the landing outside the doorway, the conversation continued. When questioned concerning the whereabouts of his mother, Wally "teeter[ed] back and forth," saying "she was at work or at the store." To Officer Berge, Wally appeared "uneasy," and his answers were not "crisp." Officer Berge thought that Wally might be in danger and that his answers might have been "coaxed" from someone within the apartment, and feared that other juveniles might be inside.

Shortly after the officers began conversing with Wally, Sergeant Donato of the Clifton Police Department Juvenile Detective Divi-

sion arrived at the scene. Also, at about that time, the telephone rang in the kitchen, which was located immediately inside the apartment. Wally picked up the receiver and told the officers that his father was on the phone. Standing outside of the apartment, Sergeant Donato asked Wally if he could speak with his parent and Wally responded, "certainly." The sergeant then walked a few steps into the apartment and was handed the receiver by Wally. While on the telephone, inside the kitchen area, Sergeant Donato was able to see into a bedroom where defendant was lying on the bottom level of a bunk bed. Defendant fit the description given earlier by Kathleen. Sergeant Donato then motioned for Officer Berge and Sergeant Dennis to enter the apartment; the two officers immediately went into the bedroom where they found the reclining defendant.

Sergeant Dennis read defendant the *Miranda*[3] warnings and asked for his name. Defendant identified himself as "Anthony Green." At that point, Sergeant Donato was on the telephone with Wally's mother. She advised the sergeant that Anthony Bogan was supposed to be caring for Wally. Upon further questioning, defendant explained that Bogan was his "maiden name." While communicating with headquarters, the officers learned that there were multiple outstanding arrest warrants for the twenty-six-year-old defendant under the name Anthony Bogan. Defendant was then handcuffed and read again his *Miranda* rights.

As he was led from the apartment, defendant admitted, in response to questioning, that he had given Kathleen a ride to 111 Russell Street in the gray Audi. He explained that although Kathleen had "gone by the apartment," she "left suddenly." Defendant stated that he "didn't touch that girl," and added that "he thought she was 18."

A Passaic County grand jury returned an indictment charging defendant with second-degree luring or enticing a child, *N.J.S.A.* 2C:13–6; fourth-degree criminal sexual contact, *N.J.S.A.* 2C:14–

---

[3] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

3(b); third-degree hindering apprehension, *N.J.S.A.* 2C:29–3(b)(1); and third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4(a).[4]

## B.

Defendant moved to suppress the statements he made to the police after he was taken into custody, claiming that because the officers entered the apartment without a warrant, they engaged in an unreasonable search and seizure in violation of the federal and state constitutions. Defendant also claimed that he did not knowingly, voluntarily, and intelligently relinquish his *Miranda* rights. After conducting a hearing, the Honorable Raymond A. Reddin, J.S.C., denied the motion on both grounds.

Judge Reddin held that the police officers were justified in entering the apartment based on the exigent circumstances and community caretaking exceptions to the warrant requirement. Judge Reddin found that the police went to 111 Russell Street to investigate the sexual molestation of Kathleen. When the officers rang the bell to the apartment, they heard an adult male voice within, but a nervous young boy opened the door, "flip flopping on where his mother was." Judge Reddin determined that delay was not an acceptable option, even if the officers could have obtained a telephonic warrant within fifteen to twenty minutes. Indeed, he believed that it "would have been outright carelessness on their part" to leave only to learn later that another child had "become victimized."

Judge Reddin considered Officer Berge, who expressed concern that other children might be in danger, to be "very credible." In the judge's mind, the officers exercised admirable restraint and took reasonable steps, without barging into the apartment, "to find out what was going on [in] this unusual and potentially dangerous

---

[4] Because the indictment mistakenly graded the luring and sexual contact charges as third-degree offenses, the indictment was amended to reflect the proper grading of those offenses.

situation." Only after Sergeant Donato took the telephone from Wally to speak with his parent was defendant sighted, in plain view, in a bedroom and thereafter arrested. Even then, other than arresting defendant, no search of the premises was conducted.

Judge Reddin concluded that the State presented "a strong showing of probable cause" and of exigent circumstances to justify the officers' actions, which were to protect Wally and "a third potential victim" and to prevent the possible flight of defendant. The judge also noted that the officers were acting in a legitimate community caretaking role, and not using that role as a pretext "to undertake an extensive search" of the apartment's premises. Last, Judge Reddin maintained that defendant was read his *Miranda* warnings twice and made a knowing, voluntary, and intelligent waiver of those rights before speaking with the police. Accordingly, the statements made by defendant to the police were admitted into evidence.

After an eight-day trial, a jury convicted defendant on all charges. The court sentenced defendant to an eight-year term of imprisonment on the luring charge and a concurrent four-year term on the hindering charge. The remaining charges were merged.[5] The court also imposed appropriate fees and penalties and advised defendant that he was subject to Megan's Law.

## C.

In an unpublished per curiam opinion, the Appellate Division reversed defendant's conviction, holding that the warrantless entry into the apartment at 111 Russell Street by the police violated the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. According to the panel, the statements made by defendant to the police

---

[5] Initially, defendant was sentenced to a four-year term on the endangering-the-welfare-of-a-child charge. That sentence was later vacated and the charge merged.

"were the fruit of an illegal search and should have been sup-pressed."

The panel rejected the trial court's finding that exigent circum-stances justified the warrantless entry, reasoning that "[t]here was ample time to secure the premises and to request a search warrant by telephone." It suggested that the police officers could hardly have been concerned about Wally's safety if they allowed him "to re-enter the apartment where the alleged perpetrator of a sexual attack" may have been lurking. It also determined that the fear that other minors might have been in danger inside the apartment was based on nothing more than "supposition."

Additionally, the panel maintained that the community caretak-ing doctrine could not supply the justification for a warrantless entry onto the premises. In the panel's view, the police arrived at the apartment building "with [the] clear objective to advance their investigation" of a sexual crime and not "for the purpose of attending to the welfare of Wally." So, "[a]lthough the police had a right to be concerned that Wally, a minor, was home and not in school, they were not acting that morning as self-deputized truant officers." Because the police actions at 111 Russell Street were not " 'totally divorced from the detection, investigation, or acquisi-tion of evidence relating to the violation of a criminal statute,' " the panel concluded that the community caretaking exception to the warrant requirement did not apply. (Quoting *State v. Stott*, 171 *N.J.* 343, 361, 794 *A.*2d 120 (2002)).

Last, the panel determined that the issuance of *Miranda* warn-ings before defendant made his incriminating statements "did not break the causal chain of events precipitated by the police's illegal entry in the dwelling" and that the admission of those statements, which should have been suppressed, was not harmless error. Therefore, a new trial was ordered.

We granted the State's petition for certification. 195 *N.J.* 521, 950 *A.*2d 907 (2008).

## II.

The State argues that Sergeant Donato's stepping into the apartment to take the telephone receiver from Wally for the purpose of speaking with the child's parent did not constitute a "search" within the intendment of the Fourth Amendment. Because Sergeant Donato was lawfully in the apartment when he observed defendant, who fit the description of the molester, the State submits, the police did not need to secure a warrant to question and arrest defendant. The State contends, alternatively, that even if entry into the apartment were deemed a "search" for Fourth Amendment purposes, the police were justified in doing so based on the community caretaking, exigent circumstances, and emergency aid exceptions to the warrant requirement. According to the State, the police were confronted with a child "home alone on a school day, clothed only in pajamas," and acting nervously, in an apartment where an alleged sexual crime had occurred a short time earlier. The State submits that the police had an obligation not only to determine who was caring for Wally, but also to enter the apartment for the limited purpose of ensuring that neither Wally nor any other child was in harm's way.

In contrast, defendant echoes the reasons given by the Appellate Division for finding that the warrantless entry into the apartment violated the Fourth Amendment and Article I, Paragraph 7 of our State Constitution. Defendant basically asserts that the police were engaged in a standard criminal investigation, which had identified the apartment as the scene of the crime, and that no emergency justified non-compliance with the warrant requirement. From defendant's viewpoint, the claim that the police officers were acting in a community caretaking function or that exigent circumstances compelled immediate action to shield Wally from danger is belied by the fact that Wally was allowed to reenter the apartment. Moreover, defendant states that there was no objective evidence that any children were at risk in the apartment. On that basis, defendant finds the police entered the apartment to pursue an alleged sexual molester, and that the

State is now advancing after-the-fact justifications for not obtaining the necessary warrant.

We begin by reviewing, generally, our jurisprudence governing searches and seizures and then analyze whether the warrantless entry into the apartment was justified under the community caretaking exception to the warrant requirement.

### III.

Both the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." [6] Deterring unreasonable governmental intrusion into a person's home is one of the chief goals of the Fourth Amendment and Article I, Paragraph 7. *State v. Cassidy*, 179 *N.J.* 150, 160, 843 *A.2d* 1132 (2004); *see also State v. Frankel*, 179 *N.J.* 586, 597–98, 847 *A.2d* 561, *cert. denied*, 543 *U.S.* 876, 125 *S.Ct.* 108, 160 *L.Ed.2d* 128 (2004); *State v. Hutchins*, 116 *N.J.* 457, 463, 561 *A.2d* 1142 (1989); *State v. Bolte*, 115 *N.J.* 579, 583–85, 560 *A.2d* 644, *cert. denied*, 493 *U.S.* 936, 110 *S.Ct.* 330, 107 *L.Ed.2d* 320 (1989). Those cognate constitutional provisions also express a preference that, before conducting a search, government officials should first obtain a warrant founded on probable cause issued by a neutral and detached judge " 'particularly describing the place to be searched, and the persons or things to be seized.' " *Frankel, supra,* 179 *N.J.* at 597–98 & n. 6, 847 *A.2d* 561 (quoting *U.S. Const.* amend. IV). The constitutional preference in favor of a warrant dictates that the entry into and search of a home without a warrant is

---

[6] The Fourth Amendment and Article I, Paragraph 7 use virtually identical language. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

presumptively invalid. *Id.* at 598, 847 *A.*2d 561. The State bears the burden of demonstrating that a warrantless search is justified by "one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." *Ibid.* (quoting *Mincey v. Arizona,* 437 *U.S.* 385, 390, 98 *S.Ct.* 2408, 2412, 57 *L.Ed.*2d 290, 298–99 (1978)).

In this case, the State has invoked the community caretaking, exigent circumstances, and emergency aid exceptions to the warrant requirement to justify the warrantless entry into the apartment at 111 Russell Street. We now turn to the community caretaking exception.

## A.

Courts have allowed warrantless searches under the Fourth Amendment when police officers have acted not in their law enforcement or criminal investigatory role, but rather in a community caretaking function. *See, e.g., Cady v. Dombrowski,* 413 *U.S.* 433, 439–48, 93 *S.Ct.* 2523, 2527–31, 37 *L.Ed.*2d 706, 713–18 (1973). In today's society, police officers perform "dual roles." *State v. Diloreto,* 180 *N.J.* 264, 276, 850 *A.*2d 1226 (2004). On the one hand, they carry out traditional law enforcement functions, such as investigating crimes and arresting perpetrators. *Ibid.* (citation omitted). On the other hand, police officers perform a wide range of social services, such as aiding those in danger of harm, preserving property, and "creat[ing] and maintain[ing] a feeling of security in the community." Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment,* 1998 *U. Chi. Legal. F.* 261, 271–72 (citation and internal quotation marks omitted); *see also Diloreto, supra,* 180 *N.J.* at 276, 850 *A.*2d 1226 ("Community caretaking . . . is based on a service notion that police serve to ensure the safety and welfare of the citizenry at large." (citation and internal quotation marks omitted)). The United States Supreme Court has recognized that "[l]ocal police officers . . . engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detec-

tion, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady, supra,* 413 *U.S.* at 441, 93 *S.Ct.* at 2528, 37 *L.Ed.*2d at 714–15. In light of the community caretaking doctrine as expressed in *Cady,* the Supreme Court justified the warrantless search of a car to locate a gun that was missing from a police officer for the primary purpose of protecting the public. *Id.* at 448, 93 *S.Ct.* at 2531, 37 *L.Ed.*2d at 718.

Under the banner of community caretaking, in *State v. Diloreto,* we upheld the constitutionality of the conduct of police officers who, acting without a warrant, took into custody the defendant who was reported as "an endangered missing person contained in [a National Crime Information Center] alert." 180 *N.J.* at 278–81, 850 *A.*2d 1226. The defendant was found in a car in an area where attempted suicides had occurred in the past. *Id.* at 278, 850 *A.*2d 1226. Before placing the defendant in a patrol car, the police patted him down, finding a loaded ammunition clip in his pocket. *Id.* at 273, 850 *A.*2d 1226. That discovery led the police to conduct an immediate warrantless search of the car so that a gun would not fall into the wrong hands, endangering the safety of the public.[7] *Id.* at 273–74, 281–82, 850 *A.*2d 1226. The warrantless seizure of the defendant was justified under the community caretaking doctrine. *Id.* at 278–82, 850 *A.*2d 1226. We held that "[i]n addition to harboring safety concerns as caretakers, the police lawfully accumulated information to meet the probable cause and exigency standards before searching defendant's car.... [T]heir conduct at the encounter's outset was totally divorced from a criminal investigatory role in satisfaction of the community caretaker doctrine." *Id.* at 282, 850 *A.*2d 1226 (citation omitted); *see also State v. Elders,* 192 *N.J.* 224, 247–48, 927 *A.*2d 1250 (2007) (noting that state troopers initially acted within community caretaking responsibility by stopping to render roadside assistance to disabled car).

---

[7] The seized handgun was later linked to a murder for which the defendant was convicted. *Id.* at 274, 850 *A.*2d 1226.

In *State v. Garbin*, the Appellate Division found that the warrantless entry into the garage of a home was justified under the community caretaking doctrine. 325 *N.J.Super.* 521, 526–27, 739 *A.*2d 1016 (App.Div.1999), *certif. denied*, 164 *N.J.* 560, 753 *A.*2d 1153 (2000). In that case, police officers observed not only smoke emanating from the garage, but also "the wheels of defendant's truck rapidly spinning," reasonably suggesting "that the car was stuck in a driving gear, that the driver was unconscious or attempting to commit suicide or, as turned out to be the case, that he was highly intoxicated." *Ibid.* In those circumstances, the court determined that the officers had an obligation, pursuant to their community caretaking responsibilities, to enter the garage without delay to ensure that the driver was not in danger. *Ibid.* The police officers in *Diloreto* and *Garbin* did not run afoul of the constitutional prohibition against unreasonable searches and seizures because in both cases they acted not in pursuit of a criminal investigation, but for the primary purpose of providing safety and protection from immediate harm to either a person or the public.

 The community caretaking role of the police also extends to protecting the welfare of children. Indeed, that community caretaking responsibility is a reflection of the State's general *parens patriae* duty to safeguard children from harm. *See Div. of Youth & Family Servs. v. M.Y.J.P.*, 360 *N.J.Super.* 426, 454–55, 823 *A.*2d 817 (App.Div.) ("New Jersey's *parens patriae* obligation to protect and promote the welfare of children extends to all children resident in this State . . . ."), *certif. denied*, 177 *N.J.* 575, 832 *A.*2d 325 (2003), *cert. denied*, 540 *U.S.* 1162, 124 *S.Ct.* 1176, 157 *L.Ed.*2d 1207 (2004). The State's *parens patriae* power "derives from the inherent equitable authority of the sovereign to protect those persons within the state who cannot protect themselves." *In re Grady*, 85 *N.J.* 235, 259, 426 *A.*2d 467 (1981).

The broadest conception of the *parens patriae* responsibility concerning children is embodied in *N.J.S.A.* 9:6–8.10, which *requires* "[a]ny person having reasonable cause to believe that" an act of child abuse has occurred to report the incident to the

Division of Youth and Family Services (DYFS). In response to a report of child abuse, DYFS then must act "to insure the safety of the child and to that end ... shall receive appropriate assistance from local and State law enforcement officials." [8] *N.J.S.A.* 9:6–8.11.

It is well-recognized that leaving children unattended may constitute a significant threat to their safety and welfare. *State v. Garland,* 270 *N.J.Super.* 31, 44–45, 636 *A.*2d 541 (App.Div.), *certif. denied,* 136 *N.J.* 296, 642 *A.*2d 1005 (1994). So, for example, in *Garland,* police officers who received credible information that two children had been left alone in a motel known to be a haven for prostitution were justified in entering a motel room without a warrant "for the purpose of ascertaining the whereabouts and condition of the children." *Id.* at 45–46, 636 *A.*2d 541. Although the court found the warrantless entry to be permissible under the emergency aid doctrine,[9] *id.* at 44–46, 636 *A.*2d 541, the court equally could have justified the actions of the police under the community caretaking doctrine, *see State v. Navarro,* 310 *N.J.Super.* 104, 109, 708 *A.*2d 416 (App.Div.) ("A danger that children ... may obtain access to a gun is one circumstance which may justify the police entering private property in the performance of their

---

[8] In articulating the State's *parens patriae* responsibility in the area of public education, we have noted that "[n]o greater obligation is placed on school officials than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others." *Frugis v. Bracigliano,* 177 *N.J.* 250, 268, 827 *A.*2d 1040 (2003).

[9] We have adopted a three-prong test to determine whether a police officer's warrantless search of a home is justified under the emergency aid doctrine. *Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561 (citing *Cassidy, supra,* 179 *N.J.* at 161, 843 *A.*2d 1132). First, police, and other public safety officials, must have an objectively reasonable belief that there is an emergency that requires "immediate assistance to protect or preserve life, or prevent serious injury." *Ibid.* Next, the "primary motivation for entry into the home must be to render assistance, not to find and seize evidence." *Ibid.* Finally, "there must be a reasonable nexus between the emergency and the area or places to be searched." *Ibid.*

community caretaking responsibilities."), *certif. denied*, 156 *N.J.* 382, 718 *A.*2d 1211 (1998).

## B.

■ In the case before us, the Appellate Division maintained that the community caretaking exception did not apply because "[t]he police presence on the scene was not 'totally divorced' from their investigation of a potential crime." (Quoting *Cady, supra,* 413 *U.S.* at 441, 93 *S.Ct.* at 2528, 37 *L.Ed.*2d at 715). The real question, however, is not the circumstances that brought the police to the scene of 111 Russell Street, but whether the actual entry into the apartment was for the legitimate purpose of fulfilling a community caretaking responsibility. So long as the police had an independent basis for entering the apartment under the community caretaking exception that was not a pretext for carrying out an investigatory search, we find no bar under *Cady* or under our federal and state constitutions for the police actions in this case. We agree with the New Hampshire Supreme Court which held:

> While the "divorce" between the community caretaking function and the role of the police in the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute must be total, ... the absolute separation need only relate to a sound and independent basis for each role, and not to any requirement for exclusivity in terms of time or space.
>
> [*State v. D'Amour,* 150 *N.H.* 122, 834 A.2d 214, 217 (2003).]

We also agree that "[t]o hold that the police can never legitimately engage in community caretaking activities merely because they are also involved in the detection, investigation, or acquisition of evidence concerning the violation of a criminal statute could lead to absurd results." *Id.* at 218. We will not read *Cady* in a way that would handcuff police officers from fulfilling a clear community caretaking responsibility, particularly one that might prevent imminent harm to a child, merely because the officers are engaged in a concurrent criminal investigation. We emphasize, however, that the community caretaking responsibility must be a real one, and not a pretext to conduct an otherwise unlawful warrantless search.

## C.

█ We now turn to the facts of this case. Three police officers converged on an apartment building where a fourteen-year-old girl named Kathleen claimed to have been sexually molested earlier in the morning. When the officers rang the bell to the second-floor apartment, an adult male voice answered, "Who is it?" and they replied, "Clifton Police." However, a child, Wally Vance, not an adult, came to the downstairs door. Wally, who looked about twelve-years old, was wearing pajamas, and told the officers he was home alone on a day when he would have been expected to be in school. The home-alone response did not explain the adult male voice the officers heard coming from the apartment. The officers walked up the landing with Wally—not entering the apartment— and questioned him about his mother's whereabouts. Wally, who appeared nervous and uneasy, gave inconsistent answers, saying at one point that his mother was at work and at another point that she was at the store. Although Officer Berge thought that Wally might be in danger and that other children might be in the apartment, the officers did not rush inside, but remained on the other side of the doorway from Wally, who stood in the apart- ment's kitchen area. When Sergeant Donato of the Juvenile Detective Division arrived on the scene, still no officer had entered the apartment. At about this time, the telephone rang inside the kitchen. Wally picked up the receiver and claimed that his father was on the phone. Sergeant Donato asked Wally if he could speak with his father, and Wally agreed. Sergeant Donato took the few steps crossing the apartment's threshold into the kitchen to take the receiver from Wally.

The issue here is whether Sergeant Donato violated the Fourth Amendment or Article I, Paragraph 7 of our State Constitution by entering into the kitchen to speak on the telephone with the parent of a child seemingly left unattended on a school day. We conclude that Sergeant Donato did not breach either our federal or state constitution by fulfilling a basic community caretaking function—inquiring of a parent why a child was home alone on a school day in an apartment where a suspected crime had occurred.

Therefore, Sergeant Donato had a right to step into the apartment to take the receiver from Wally; he did not need a warrant from a judge to do so. The trial judge had found that the need to communicate with Wally's parents was not a pretext for the police to enter a home to conduct a search for a perpetrator. Sergeant Donato had an independent basis, separate from any criminal investigation, to inquire whether a responsible adult was attending to Wally and to ask a parent simple questions concerning a child's safety and welfare. In short, Sergeant Donato was not engaged in an unlawful search.

It is also important to emphasize what did not happen when Sergeant Donato took the telephone. The other officers waiting outside the doorway did not charge in and fan out throughout the apartment looking for a suspect or for evidence of a crime. Even as Sergeant Donato took the telephone from Wally, the other officers respected the threshold of the apartment.

Only when Sergeant Donato, while on the telephone, observed defendant, who fit the description of Kathleen's molester, lying on a bed in a nearby room, did the sergeant signal for the officers to enter and question defendant. Sergeant Donato was lawfully on the premises when he observed defendant, and given the plain view doctrine, the police did not have to wait for judicial permission to question and eventually take defendant into custody.[10] *See Frankel, supra,* 179 *N.J.* at 599–600, 610, 847 *A.*2d 561 (holding that evidence observed in plain view and seized by police

_____

[10] The applicability of the plain view doctrine is not at issue in this case. The plain view doctrine requires the satisfaction of three factors:

First, the police officer must be lawfully in the viewing area.

Second, the officer has to discover the evidence "inadvertently," meaning that he did not know in advance where evidence was located nor intend beforehand to seize it.

Third, it has to be "immediately apparent" to the police that the items in plain view were evidence of a crime, contraband, or otherwise subject to seizure.

[*State v. Bruzzese,* 94 *N.J.* 210, 236, 463 *A.*2d 320 (1983) (citations omitted), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984).]

officer who is lawfully on premises is admissible (citing *Mincey, supra,* 437 *U.S.* at 393, 98 *S.Ct.* at 2413, 57 *L.Ed.*2d at 300)); *see also State v. Bruzzese,* 94 *N.J.* 210, 237, 463 *A.*2d 320 (1983) ("We do not believe that a police officer lawfully in the viewing area must close his eyes to suspicious evidence in plain view."), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984).

Overall, the actions taken by the police officers to address the swiftly moving events and uncertain circumstances confronting them were objectively reasonable. We need not resolve whether the emergency aid doctrine or exigent circumstances also would have allowed the police officers to enter the apartment without a warrant to ensure the safety of Wally or other potential victims. Here, the community caretaking doctrine provided sufficient justification for the steps taken by the police. As noted, there was no headlong rush into the apartment by the police. The carefully modulated response of the officers, and of Sergeant Donato in particular, falls within the well-accepted limits of the community caretaking exception to the warrant requirement.

 To the extent that the Appellate Division's factual conclusions are different from those reached by the trial court, we must defer to those fact-findings made by the trial court "supported by sufficient credible evidence in the record." *Elders, supra,* 192 *N.J.* at 243, 927 *A.*2d 1250 (citations and internal quotation marks omitted). The Appellate Division underscored that "the [testifying] officer's contention that the police were fearful of Wally's safety is undercut by the fact that the officers allowed [him] to go from a position of safety on the first floor of the building and to re-enter the apartment." However, Wally was never out of the sight of the officers. The trial judge, who listened to the testimony, concluded that the testifying officer expressed a true, not a feigned, concern

---

The term "immediately apparent" in the third factor means that the police officer must have "probable cause to associate the item[s] with criminal activity." *Id.* at 236–37, 463 *A.*2d 320; *see also State v. Johnson,* 171 *N.J.* 192, 207–08, 793 *A.*2d 619 (2002) (citing *Arizona v. Hicks,* 480 *U.S.* 321, 327, 107 *S.Ct.* 1149, 1153, 94 *L.Ed.*2d 347, 354–55 (1987)).

for Wally's welfare. The Appellate Division posited that the officers could have taken Wally into custody while they sought a warrant for the premises. That, however, would have dictated a greater intrusion into Wally's liberty interests, and though it may have been one possible approach, it was not the only constitutionally reasonable one.

The question is not whether the police could have done something different, but whether their actions, when viewed as a whole, were objectively reasonable. *Diloreto, supra,* 180 *N.J.* at 278, 850 *A.*2d 1226. The trial court found that the police acted in an objectively reasonable manner. We see no reason to disturb that finding. Thus, we hold that the warrantless entry of the second-floor apartment under the community caretaking exception comported with both our federal and state constitutions.

Because Sergeant Donato had a lawful right to be in the apartment when he observed defendant who fit the description of Kathleen's assailant, he had a corresponding duty to direct his fellow officers to question the suspect. *See Frankel, supra,* 179 *N.J.* at 599–600, 847 *A.*2d 561. Under those circumstances, the officers did not have to suspend their movements to secure a warrant. Defendant made incriminating statements to the police after he was informed of his *Miranda* rights and after he knowingly, voluntarily, and intelligently waived those rights. We therefore conclude that the trial court properly denied defendant's motion to suppress the statements defendant made to the police.

## IV.

For the reasons expressed, we reverse the judgment of the Appellate Division, uphold the trial court's denial of defendant's motion to suppress, and reinstate defendant's convictions.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.