**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1487-15T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JENNIFER R. WIGGINS,

    Defendant-Appellant.

_____

        Submitted May 2, 2017 — Decided May 31, 2017

        Before Judges Ostrer and Vernoia.

        On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 15-01-0010.

        Joseph E. Krakora, Public Defender, attorney for appellant (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the brief).

        Christopher S. Porrino, Attorney General, attorney for respondent (Arielle E. Katz, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

    The principal issue in this appeal pertains to the community caretaking exception to the warrant requirement. See, e.g., Cady

v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528, 37 L. Ed. 2d 706, 714-15 (1973); State v. Scriven, 226 N.J. 20, 38 (2016); State v. Bogan, 200 N.J. 61, 78-80 (2009); State v. Diloreto, 180 N.J. 264, 275-76 (2004). Invoking that exception to justify a motor vehicle stop, the trial court denied defendant's motion to suppress drugs and weapons discovered after the stop. Defendant Jennifer Wiggins subsequently pleaded guilty to two counts of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), and fourth-degree possession of marijuana, N.J.S.A. 2C:35-10(a)(3). Pursuant to the plea agreement, the court sentenced her to an aggregate term of five years imprisonment, with forty-two months of parole ineligibility.

Defendant challenges the court's denial of her suppression motion. She also contends, for the first time on appeal, that her conviction was barred by L. 2013, c. 117. We affirm.

I.

The trial court credited the testimony of the sole witness at the suppression hearing, Vineland Police Officer Mustafa Ozdemir. He testified that shortly before midnight on September 2, 2013, while working alone on drunk driving patrol, he observed

a Honda Accord with a non-working center brake light[1] as it approached an intersection. Viewing the non-working light as a safety hazard, Ozdemir performed a traffic stop in order to inform the driver the light was not working. He admitted that he also believed the non-working light was a motor vehicle violation.[2]

Ozdemir parked behind the Honda and cautiously approached the vehicle on the passenger side. He observed a frontseat passenger hand a bag of green vegetation to a backseat passenger. At that point, the officer's concern about the brake light apparently receded. The officer then illuminated his flashlight, announced his presence, and asked the driver for credentials. During this initial exchange, he detected the odor of burnt marijuana and noticed that the three occupants appeared to have bloodshot eyes.

Backup soon arrived. In the course of the police officers' subsequent investigation, they seized marijuana; discovered and seized one handgun and crack cocaine in the possession of a

---

[1] Also called a "cyclops brake light," the light is defined under N.J.S.A. 39:3-66.3 as a "high-mounted rear stoplight on the vertical centerline."

[2] He stated, "As part of my community care taking, as I explained earlier, you — we have — a reasonable person would believe that a motor vehicle violation was, in fact, occurring. And, as part of the community care taking, one of our duties is to advise the community of possible hazards."

passenger who was patted down; and discovered another handgun partly under the front passenger seat, which was later seized.[3]

The trial judge credited the officer's stated reason for stopping the vehicle — to inform the driver of the non-working light. The court rejected the argument that reference to the light was a pretext for an investigatory stop. In the judge's view, the officer's cautious approach to the vehicle was not inconsistent with his purpose in conducting the stop.

The court relied in part on three of our decisions sustaining traffic stops based on the community caretaking exception: State v. Cohen, 347 N.J. Super. 375 (App. Div. 2002), State v. Martinez, 260 N.J. Super. 75 (App. Div. 1992), and State v. Goetaski, 209 N.J. Super. 362 (App. Div.), certif. denied, 104 N.J. 458 (1986), which we discuss at greater length below. The judge concluded that although a non-functioning center brake light was not then a motor vehicle violation, the center light nonetheless enhanced vehicle safety. Its inoperability therefore posed a safety hazard, and the officer was justified in stopping the vehicle under the community caretaking exception.

On appeal, defendant contends:

---

[3] According to the trial judge, a vehicle search pursuant to a warrant also led to the seizure of bullets, as well as heroin and additional cocaine. Defendant does not challenge the legality of any of the post-stop searches and seizures.

POINT I

THE STOP OF THE DEFENDANT'S CAR, PURPORTEDLY
JUSTIFIED UNDER THE "COMMUNITY CARETAKING"
EXCEPTION TO THE WARRANT REQUIREMENT,
CONSTITUTED AN UNLAWFUL SEIZURE, AND ITS
RESULT MUST THEREFORE BE SUPPRESSED. U.S.
CONST., AMEND. IV; N.J. CONST. (1947), ART.
1, PAR. 7.

POINT II

THE SEIZURE OF GUNS OCCURRED DURING THE
STATUTORY AMNESTY PERIOD. ACCORDINGLY,
POSSESSION OF THOSE GUNS CANNOT CONSTITUTE A
CRIME, AND DEFENDANT'S PLEA MUST BE VACATED.
(NOT RAISED BELOW).

II.

On a motion to suppress, we are bound to defer to the trial court's findings supported by sufficient credible evidence in the record, particularly when they are grounded in the judge's feel of the case and ability to assess the witnesses' demeanor and credibility. State v. Robinson, 200 N.J. 1, 15 (2009); State v. Elders, 192 N.J. 224, 243-44 (2007). We review issues of law de novo. State v. Cryan, 320 N.J. Super. 325, 328 (App. Div. 1999).

"The community-caretaking doctrine recognizes that police officers provide a wide range of social services outside of their traditional law enforcement and criminal investigatory roles." Scriven, supra, 226 N.J. at 38 (internal quotation marks and citations omitted). The doctrine provides an independent justification for intrusions into citizens' liberty that would

5                                                    A-1487-15T1

otherwise require a showing of probable cause or reasonable and articulable suspicion of criminal behavior. Diloreto, supra, 180 N.J. at 276. In applying the doctrine, the courts have long recognized the importance of law enforcement's concern for the proper and safe operation of automobiles. See Cady, supra, 413 U.S. at 441, 93 S. Ct. at 2528, 37 L. Ed. 2d at 714-15 (establishing the doctrine within the context of state regulation of vehicles). Our Supreme Court has found that the community caretaker role permits officers to "check on the welfare or safety of a citizen who appears in need of help on the roadway without securing a warrant or offending the Constitution." Scriven, supra, 226 N.J. at 38.

The doctrine entails a two-part inquiry. First, a court must ask whether the officer has reacted to an objectively reasonable community concern. Id. at 39 (stating that officers must have an "objectively reasonable basis" to stop a vehicle to provide aid or check a motorist's welfare); Diloreto, supra, 180 N.J. at 278 ("[T]he caretaker doctrine permits the police to exceed a field inquiry's level of intrusiveness, provided that their action is . . . objectively reasonable under the totality of circumstances."); see also State v. Drummond, 305 N.J. Super. 84, 88 (App. Div. 1997).

That concern must serve as a distinct motivation for the officer's conduct, divorced from any desire to further a criminal investigation.  In other words, community caretaking may not serve as a pretext for a warrantless intrusion into a citizen's liberty that does not satisfy another warrant exception.  Bogan, supra, 200 N.J. at 77; see Diloreto, supra, 180 N.J. at 280.  However, the "divorce" between the two police functions "need only relate to a sound and independent basis for each role, and not to any requirement for exclusivity in terms of time or space."  Bogan, supra, 200 N.J. at 77 (quoting State v. D'Amour, 834 A.2d 214, 217 (N.H. 2003)).  Notably, an officer may engage in community caretaking concurrently with a criminal investigation.  Ibid.

Second, the court must discern whether the actions taken by an officer pursuant to his community caretaking remained within the limited scope justified by the caretaking function.  As with all police stops, the officer's conduct must be "reasonably related in scope to the circumstances which justified the interference in the first place."  State v. Dickey, 152 N.J. 468, 476 (1998) (quoting Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889, 905 (1968)).  Moreover, an officer's "community caretaking inquiry must not be 'overbearing or harassing in nature.'"  Drummond, supra, 305 N.J. Super. at 89 (quoting State v. Davis, 104 N.J. 490, 503 (1986)).

As these legal standards imply, the two-part application of the community caretaking doctrine is a fact-sensitive inquiry. In several cases, we have found that police had an objectively reasonable basis to engage in community caretaking. For example, in Cohen, supra, 347 N.J. Super. at 380-81, we stated that police were authorized to conduct a stop to inspect darkly-tinted windows that obstructed vision and posed an apparent "hazardous vehicular condition." In Martinez, supra, 260 N.J. Super. at 77-78, we authorized a stop of a vehicle travelling less than ten m.p.h. in a twenty-five m.p.h. residential zone without flashers at 2:00 a.m. because there were reasonable concerns that the driver was in distress, the vehicle was disabled, or the slow driving posed a hazard to other motorists. And in Goetaski, supra, 209 N.J. Super. at 364-65, we held the officer was justified in stopping a motorist driving slowly at 4:00 a.m., with a left blinker flashing, while on the shoulder of a rural state highway.

In addition to circumstances presented in Cohen, Martinez, and Goetaski, which the trial court cited, we have relied upon the community caretaking doctrine in ruling that police were authorized to stop a vehicle at 12:20 a.m. after it was weaving within its lane at thirty-six m.p.h. in a forty-five m.p.h. zone. State v. Washington, 296 N.J. Super. 569, 571-72 (App. Div. 1997). Police were also authorized by the doctrine to investigate a

8

parked, darkened car at a closed car wash at 11:44 p.m. Drummond, supra, 305 N.J. Super. at 86-88. In both cases, officers reasonably suspected that the occupants might be in distress, pose a threat to others, or need assistance.

On the other hand, distinguishing Goetaski, Martinez, and Washington, the Court in Scriven held the trial court correctly determined that the community caretaking doctrine did not authorize an officer to stop a motorist who was operating his high beams under circumstances that did not affect oncoming vehicles or otherwise affect the safety of others. Scriven, supra, 226 N.J. at 36, 38-40. The Court noted that the driver's use of his high beams "did not suggest that the driver of the car was impaired or that the vehicle had a problem." Id. at 39 (internal quotation marks omitted). The Court recognized that an officer may instruct a driver to dim high beams if their brightness impairs an officer's or road workers' ability to perform tasks; yet, the officer in Scriven stopped the vehicle for a different reason — he mistakenly and unreasonably believed the driver violated N.J.S.A. 39:3-60. Id. at 39-40.

Similarly, in State v. Cryan, we found that the community caretaking doctrine did not justify a stop when the driver merely paused for about five seconds after a stoplight turned green at

approximately 4:24 a.m.[4]  Cryan, supra, 320 N.J. Super. at 327, 331.  Simply put, that delay was not enough for an objectively reasonable officer to conclude that the driver was experiencing difficulty, thereby posing a hazard to himself or others.  Id. at 331.

Applying these principles, we discern no error in the trial court's decision.  Given our standard of review, we are constrained to defer to the trial judge's determination that the officer stopped the Honda in order to advise the driver of the non-working brake light.  The judge rejected the argument that the brake light condition was a pretext to conduct an investigatory stop.

We also discern no error in the court's conclusion that the stop furthered the community caretaking purpose.  Although the law had not yet required motorists to maintain operational center brake lights,[5] it is evident nonetheless that the light serves the purpose of making vehicles safer.  The center brake light's obvious design is to alert following drivers that a vehicle's brakes have been applied and it is about to slow or stop.  As the center brake

---

[4] By contrast, a significant delay may justify an objectively reasonable concern about the driver's welfare, or raise a reasonable and articulable suspicion that his inattentiveness was due to intoxicants.

[5] The Legislature required center brake lights in cars made after 1985 when it adopted L. 2013, c. 230, § 2, which became effective on March 1, 2014.

light may be more noticeable than the other lower-situated brake lights, it may prompt the following driver to slow sooner and help avoid rear end collisions.

The officer observed that the brake light was not working. That equipment condition affected the safety of the passengers in the vehicle and those in any vehicle that might follow it. Unlike cases involving a slow travelling vehicle, where an officer may only suspect equipment trouble or other distress, the equipment trouble in this case was readily apparent to the officer. Consistent with the principles of the community caretaking doctrine, the officer was authorized to conduct a limited traffic stop to advise the driver of the Honda that the brake light was not working.

The scope of the officer's inquiry was also appropriate. It bears repeating that, consistent with the principles enumerated in Dickey, an officer may not expand a community caretaking stop into a free-ranging investigatory stop. Notably, however, our courts have consistently found that traffic stops are an appropriate means of responding to a reasonable community caretaking concern. See Cohen, supra, 347 N.J. Super. at 380-81; Martinez, supra, 260 N.J. Super. at 77-78; Goetaski, supra, 209 N.J. Super. at 364-65. We have acknowledged an officer need not simply permit a community hazard to pass by. The law does not

dictate the precise manner in which officials may perform their caretaking function. See Bogan, supra, 200 N.J. at 81 (noting that, when applying the community caretaking doctrine, "[t]he question is not whether the police could have done something different, but whether their actions, when viewed as a whole, were objectively reasonable").

We hasten to add, however, that if the purpose of a stop is to advise a motorist of non-operational equipment that does not constitute a motor vehicle violation, it is questionable whether the officer can go beyond that purpose and even request the driver's credentials. Cf. Scriven, supra, 226 N.J. at 40 (noting that the officer did not simply "signal to the driver to dim her high beams because they were interfering with his mission," but instead effectuated a motor vehicle stop because he unreasonably believed the driver violated the law). As the United States Supreme Court has held, absent applicability of a warrant exception, "stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." Delaware v. Prouse, 440 U.S. 648, 663, 99 S. Ct. 1391, 1401, 59 L. Ed. 2d 660, 673 (1979).

However, we need not define in detail the scope of activity authorized by the community caretaking doctrine in a case like

this. As the officer approached the vehicle, he observed the frontseat passenger hand off a bag of green vegetation. That plain view observation provided a new and separate crime-fighting-related basis to continue the stop. See Bogan, supra, 200 N.J. at 379-80 (noting the plain view doctrine permitted an officer to question and detain the defendant without "judicial permission" after the officer had lawfully entered the apartment where defendant was hiding pursuant to the community caretaking doctrine).

We acknowledge that the State now asserts an alternative basis for sustaining the stop. Citing Heien v. North Carolina, ___ U.S. ___, 135 S. Ct. 530, 190 L. Ed. 2d 475 (2014), and State v. Sutherland, 445 N.J. Super. 358 (App. Div.), leave to appeal granted, ___ N.J. ___ (2016), the State contends that the officer had a reasonable and articulable suspicion of a violation of N.J.S.A. 39:3-66.3, even though the Legislature did not require center brake lights until several months after the stop. The State apparently did not press this argument before the trial court, nor did the trial court address it.[6] Inasmuch as we affirm the trial court's decision grounded in the community caretaker

_____

[6] We do not have the State's trial court brief. However, in oral argument, which occurred before Heien and Sutherland were decided, the assistant prosecutor relied upon the community caretaking function as a basis for the stop.

doctrine, we need not address whether a reasonable mistake of law might have justified the stop.

In sum, the trial court did not err in denying defendant's motion to suppress.

III.

Defendant contends her conviction should be set aside because, under L. 2003, c. 117, her possession of guns in September 2013 was not a crime. We disagree.

The statute upon which defendant relies states:

> Any person who has in his possession a handgun in violation of subsection b. of [N.J.S.A. 2C:39-5] . . . on the effective date of this act [August 8, 2013] may retain possession of that handgun . . . for a period of not more than 180 days after the effective date of this act. During that time period, the possessor of that handgun . . . shall:
>
> (1) transfer that firearm to any person lawfully entitled to own or possess it; or
>
> (2) voluntarily surrender that firearm pursuant to the provisions of [N.J.S.A. 2C:39-12].
>
> [L. 2013, c. 117, § 1.]

Under N.J.S.A. 2C:39-12, a person will not be held criminally liable for possessing a firearm "if after giving written notice of his intention to do so . . . he voluntarily surrendered the weapon[.]"

14

Defendant had the burden to prove the amnesty law applied to her, as it served her interest to do so, and the amnesty law did not create an element of the offenses charged. See N.J.S.A. 2C:1-13(d) (stating that the burden of proof for a finding of fact that is not an element of the offense rests on the party whose interests will be furthered if the finding were made). She has failed to do so. Instead, she admitted in her plea colloquy that she violated N.J.S.A. 2C:39-5 in September 2013.

According to the statute's plain language, see In re Kollman, 210 N.J. 557, 568 (2012) (stating if the statute's plain language is clear, the court's interpretative task is complete), it applies only to persons in possession of a weapon on the effective date. See State ex rel. C.L.H.'s Weapons, 443 N.J. Super. 48, 56 (App. Div. 2015). Defendant presented no evidence that she possessed the firearms on August 8, 2013, that she provided written notice to authorities, or that she voluntarily surrendered the firearms. The statute was not intended to shield from prosecution a person who "voluntarily surrender[s]" a weapon only "after it has already been seized" by authorities. Id. at 56-57 (internal quotation marks omitted). In sum, the statute has no impact on her conviction.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1487-15T1