# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3864-17T4

STATE OF NEW JERSEY,
IN THE INTEREST OF E.J.,

      a Juvenile.

_____

Submitted March 4, 2019 – Decided March 15, 2019

Before Judges Haas and Sumners.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FJ-21-0016-18.

Richard T. Burke, Warren County Prosecutor, attorney for appellant State of New Jersey (Matthew P. Tallia, Assistant Prosecutor, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for respondent E.J. (Neil A. Gillespie, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

By leave granted, the State appeals from the Law Division's March 28, 2018 order granting E.J.'s motion to suppress evidence found in a house after an

occupant of the home asked the police to perform a welfare check to make sure the other occupants were safe. Having considered the State's arguments in light of the record and applicable principles of law, we reverse.

At approximately 9:24 a.m. on July 4, 2017, Officer William Lance responded to a residence in a public housing project after dispatch received a 911 call. He was met there by Officer Hulse.

Upon arrival, Officer Lance saw a man he knew as Terrell Johnson pacing in front of the home. There was another man, Walter Chisholm, who was in front of a house "a couple of doors down" from Johnson's home. The men were about twenty feet away from each other and they "were swinging their arms around" and "speaking gibberish." Both men appeared to be intoxicated.

Officer Lance recognized Johnson because he had had prior encounters with him. The officer knew that Johnson lived in the house with his girlfriend Deanna, and her children. When Officer Lance spoke to Johnson, he confirmed he resided there.

Johnson told Officer Lance that he "was concerned with the welfare of his girlfriend Deanna . . . and her children who were inside the residence." Although Johnson was "slurring his words," Officer Lance testified that Johnson lucidly stated "that he was afraid for his life. There were knives in the house. He was

concerned for the children and Deanna." Johnson kept repeating, "[t]hey have knives. There are people after me. They want to kill me." Johnson then asked the officers to go into his home and check on his girlfriend and the children.[1] Officer Lance testified that based upon Johnson's request and the information he provided, he believed "[t]hat there could be people with knives inside the home, and that there were children that could be in jeopardy, children and the girlfriend Deanna."

The officers found that the screen door at the front of the house was unlocked, and they could see an individual lying on a couch in the living room. Officer Lance announced himself as a police officer in a "loud boisterous voice," but the individual did not move. The officers then went into the house. Officer Lance explained that the officers needed to quickly "clear" all the rooms in the home to protect their safety and that of the occupants.

Once inside the home, Officer Lance woke the individual on the couch, who identified himself as one of Deanna's children. Officer Lance asked if there was anyone else in the house, and the juvenile replied, "yes, there were people upstairs." The officer then heard "a shuffling coming from the upstairs room."

---

[1] Officer Lance also explained that Johnson did not assert that he was afraid of Chisholm or that Chisholm was the source of his fear that his girlfriend and her children were in danger inside the home.

A-3864-17T4

Officer Lance continued to announce that he was a police officer in a loud voice and the officers proceeded to the second floor. As they were walking up the stairs, the officers could smell marijuana.

Officer Lance knew the layout of the home and that there were three bedrooms. In the first bedroom, the officers found Deanna "passed out, almost face down on the bed." Officer Lance could see that the second bedroom was empty. He then heard "a commotion going on in the middle bedroom."

Officer Lance testified that the door to that bedroom was slightly open, and he "used [his] left foot to push the door ajar." As soon as he did so, he saw E.J. "standing in front of . . . the doorway with a handgun in his hand pointing it in my direction." Officer Lance shouted "gun" to Officer Hulse, and E.J. threw the gun on the bed next to him. When he did so, the officer could see there was a female laying under the covers.

Officer Lance ordered E.J. to get on the floor, but he failed to comply. The officer kicked E.J. in the chin and he went to the floor. The officers then handcuffed and arrested him. At that point, E.J. told the officers that he was a juvenile.[2] After the officers gave E.J. his Miranda[3] rights, he stated he had not

---

[2]  It does not appear that E.J. was one of Deanna's children.

[3]  Miranda v. Arizona, 384 U.S. 436 (1966).

heard the officers announce themselves, and that "[h]e thought someone was coming to rob him." Officer Lance then saw several bags of marijuana on the bedroom dresser, in an open dresser drawer, and on the floor of the bedroom. No one else was found in the home.

The police charged E.J. with committing acts which, if committed by an adult, would constitute second-degree possession of a weapon by a convicted person, N.J.S.A. 2C:39-7(a); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); third-degree aggravated assault by pointing a firearm at a police officer, N.J.S.A. 2C:12-1(b)(9); fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-3(d); fourth-degree possession of hollow-nosed bullets, N.J.S.A. 2C:39-3(f)(1); and possession of less than fifty grams of marijuana, a disorderly persons offense under N.J.S.A. 2C:35-10(a)(4).

Officer Lance was the only witness at the suppression hearing. At the end of the proceeding, the trial judge stated "that the officer who had testified appeared to be credible. There didn't appear to be and from what I have heard any evidence of any ulteri[or] motive here."

Nevertheless, the judge granted E.J.'s motion to suppress the gun and marijuana found in the house. Even though the officers knew that Johnson lived in the house with his girlfriend and her children, and even though Johnson

confirmed this fact when he asked Officer Lance to conduct a welfare check to ensure that his loved ones were safe, the judge found that "[t]here [was] insufficient evidence from which to conclude that [Johnson] lived there or had any lawful right to invite the police to search." In his brief written opinion, the judge also stated that because Johnson appeared to be intoxicated, he could not "find that [Johnson] had the mental capacity to consent to a search."

Despite Officer Lance's undisputed testimony that Johnson never claimed that Chisholm was the source of his fear, the judge stated that "[a]ny perceived threat came from Mr. Chisholm, who was outside in the presence of other police officers." The judge also noted that the "house was not on fire"; there was "[n]o screaming"; "[n]o arguments"; "[n]o smell of smoke or gas"; and "[n]o one appeared to be choking or otherwise in distress." Therefore, the judge concluded that no exigent circumstances existed to permit the officers to enter the home to check on the welfare of Johnson's girlfriend and her children. This appeal followed.

On appeal, the State argues that "the trial court erroneously granted [E.J.'s] motion to suppress." We agree.

When reviewing an order granting or denying a motion to suppress evidence, we accept a trial court's findings of fact if they are supported by

sufficient credible evidence in the record.  State v. Gamble, 218 N.J. 412, 424 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)).  Deference should be afforded to a trial judge's findings when they are "substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy."  State v. Johnson, 42 N.J. 146, 161 (1964).  If the trial court's decision is based upon a legal conclusion, "we conduct a de novo, plenary review."  State v. Rockford, 213 N.J. 424, 440 (2013).  "A trial court's interpretation of the law . . . and the consequences that flow from established facts are not entitled to any special deference."  Gamble, 218 N.J. at 425.

Under the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, "[a] warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement."  State v. Cooke, 163 N.J. 657, 664 (2000) (citing State v. Alston, 88 N.J. 211, 230 (1981)).  The same is true of the warrantless seizure of a person or property.  Terry v. Ohio, 392 U.S. 1, 19-21 (1968) (seizure of a person); see State v. Hempele, 120 N.J. 182, 216-17 (1990) (seizure of property).

Here, the State asserted that the officers were permitted to enter Johnson's home because he asked them to do so.  A recognized exception to the warrant

requirement is a party's consent to search a home.  State v. Cushing, 226 N.J. 187, 199 (2016).  A party's ability to consent to a search "rests on his or her 'joint occupation' of and 'common authority' over the premises."  Ibid. (quoting Fernandez v. California, 571 U.S. 292, 300-301 (2014); Illinois v. Rodriguez, 497 U.S. 177, 181(1990)).  "A co-habitant who possesses common authority over or has a sufficient relationship to the premises or effects sought to be inspected may voluntarily consent to a lawful search."  State v. Lamb, 218 N.J. 300, 315 (2014) (citing United States v. Matlock, 415 U.S. 164, 171 (1974)).  These third parties may have actual authority to consent "based on their common use of the space searched."  Cushing, 226 N.J. at 200 (citing State v. Suazo, 133 N.J. 315, 319-20 (1993)).

The judge's finding that the evidence presented at the suppression hearing was insufficient to demonstrate that Johnson lived in the home with his girlfriend and the children, and therefore had the ability to invite the police to conduct a welfare check, is not supported by the record.  Indeed, all of the credible evidence is to the contrary.  Officer Lance testified that he knew Johnson from having prior encounters with him.  He knew that Johnson lived in the home and that he resided there with his girlfriend Deanna and her children. Even if Officer Lance did not have this prior knowledge, Johnson again told the

police he resided in the home before asking them to enter to check on the safety of the other occupants. Under these circumstances, Johnson plainly had the authority to request the welfare check, thereby giving his consent to the police to enter the home. Lamb, 218 N.J. at 318.

Moreover, even if Johnson did not have actual authority to consent, he had the "apparent authority" to do so. Apparent authority "arises when a third party (1) does not possess actual authority to consent but appears to have such authority and (2) the law enforcement officer reasonably relied, from an objective perspective, on that appearance of authority." Cushing, 226 N.J. at 199-200 (citing Rodriguez, 497 U.S. at 185-89). "The question is 'whether the officer's belief that the third party had the authority to consent was objectively reasonable in view of the facts and circumstances known at the time of the search.'" State v. Coles, 218 N.J. 322, 340 (2014) (quoting Suazo, 133 N.J. at 320).

Here, the officers knew that Johnson was a resident of the home, and knew that he lived there with his girlfriend and her children. Johnson also told them he lived there on the date of the incident. He explicitly asked the officers to go into the home and make sure that the other residents were safe. The judge found that Officer Lance was a credible witness. Thus, in light of the facts and

circumstances known at the time of the search, Officer Lance's belief that Johnson had actual authority to consent was objectively reasonable. Therefore, the officers' entry into the residence at Johnson's request was permissible under the consent exception to the warrant requirement.

The judge's conclusion that Johnson was too intoxicated to request, or consent to, the welfare check is also not supported by the record or the governing case law. To be valid, the party's consent to a search must be knowing and voluntary. State v. Domicz, 188 N.J. 285, 305 (2006). "Voluntariness is a question of fact to be determined from all the circumstances . . . ." Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973). The intoxication of a defendant does not automatically mean that he or she cannot knowingly and voluntarily waive a constitutional right. State v. Warmbrun, 277 N.J. Super. 51, 61-62 (App. Div. 1994) (holding that in determining whether an intoxicated defendant validly consented to a waiver of his Miranda rights, the court must consider the totality of the circumstances, including whether the individual was able to demonstrate an understanding of their actions despite their condition); see also State v. Bauman, 298 N.J. Super. 176, 194 (App. Div. 1997) (holding that "[a] jury charge on voluntary intoxication is required only if there exists a 'rational basis for the conclusion that [the] defendant's "faculties" were so "prostrated"

that he or she was incapable of forming' the requisite intent") (quoting State v. Mauricio, 117 N.J. 402, 418-19 (1990)).

Applying these principles, we conclude that the judge's determination that Johnson was too intoxicated to request the welfare check is simply not supported by the credible evidence in the record. Although Johnson was slurring his words and "talking gibberish" when the police arrived, Officer Lance testified that he began "making sense" when he repeatedly told the police "that he was afraid for his life" and "[h]e was concerned for the children and Deanna." Johnson demonstrated he was aware of his surroundings by telling the officers that he lived in the residence, and he was able to relate that his girlfriend and the children were also at home. He kept insisting that he and his loved ones were in danger. Nothing in the record indicates that Johnson's faculties were so prostrated that he could not form the intent to ask the police to conduct a quick welfare check inside his home to ensure that everyone was safe.

Because Johnson consented to the police entry into the home, the police did not first have to obtain a warrant to follow through with his request. However, even if this were not the case, the search was also appropriate under the community-caretaking doctrine even if there was no valid consent.

This doctrine, first enunciated by the United States Supreme Court in Cady v. Dombrowski, 413 U.S. 433 (1973), is based on the idea that police officers "often are called on to perform dual roles." State v. Diloreto, 180 N.J. 264, 276 (2004). The doctrine applies when the "police are engaged in functions, [which are] totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a [criminal] statute." Id. at 275 (alterations in original) (quoting State v. Cassidy, 179 N.J. 150, 161 n.4 (2004)).

The doctrine serves as an exception to the warrant requirement for a search (1) when the officers' actions are "unconnected to a criminal investigation" and (2) when their actions are "objectively reasonable under the totality of the circumstances." Id. at 278. The question "is not the circumstances that brought the police to the scene . . ., but whether the actual entry into the [home] was for the legitimate purpose of fulfilling a community caretaking responsibility." State v. Bogan, 200 N.J. 61, 77 (2009).

In New Jersey, "[w]ithout the presence of consent or some species of exigent circumstances, the community-caretaking doctrine is not a basis for the warrantless entry into and search of a home." State v. Vargas, 213 N.J. 301, 321 (2013) (emphasis added). Nevertheless, "[p]olice officers serving in a

community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement." Id. at 323. The emergency-aid exception applies in exigent circumstances, allowing an officer to enter a home without a warrant if the officer has "'an objectively reasonable basis to believe that an emergency requires that he [or she] provide immediate assistance to protect or preserve life, or to prevent serious injury' and there is a 'reasonable nexus between the emergency and the area or places to be searched.'" Id. at 323-24 (quoting State v. Edmonds, 211 N.J. 117, 132 (2012)).

The judge incorrectly concluded that emergency aid could only be provided to Johnson and the other occupants of the house if there was a fire, a loud argument, the smell of smoke or gas, someone choking, or knives in plain view in the house. As noted above, however, only "some species of exigent circumstances" was required to enable the police to enter the home to check on the welfare of the occupants. Vargas, 213 N.J. at 321. When the police arrived, Johnson repeatedly told them that he feared for his life because there were people with knives inside his home with his girlfriend and her children.

Under those circumstances, Officer Lance reasonably believed that he needed to enter the home, as Johnson requested, to check on the welfare of his

loved ones.[4]  Therefore, the police properly responded to Johnson's request under the community-caretaking doctrine and the evidence they observed in plain view as they conducted the welfare check was properly seized.

For these reasons, we reverse the judge's decision granting E.J.'s motion to suppress, and remand the matter for further proceedings.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4]  Contrary to the judge's observation, there was nothing untoward about Officer Lance asking the individual on the couch whether there were other people in the home before inquiring whether the individual was in danger.  As the officer explained, the police needed to quickly ascertain who was in the home in order to ensure their own safety and that of the other occupants.