**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1010-17

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANDRE HIGGS,

    Defendant-Appellant.

_____

Argued May 6, 2020 – Decided May 14, 2021

Before Judges Fuentes, Haas, and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket Nos. 15-11-2648 and 15-11-2650.

John J. McMahon, attorney for appellant (John J. McMahon and Lois De Julio, of counsel and on the briefs).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Matthew E. Hanley, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

FUENTES, P.J.A.D.

On November 6, 2015, an Essex County grand jury returned Indictment No. 15-11-2648 charging defendant Andre Higgs with murder, N.J.S.A. 2C:11-3(a)(1) and (2), (count one); third degree aggravated assault, N.J.S.A. 2C:12-1(b)(9), (count two); second degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), (count three); second degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a), (count four); second degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a), (count five); third degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1), (count six); and third degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a), (count seven). On the same date, an Essex County grand jury[1] returned Indictment No. 15-11-2650, charging defendant with first degree unlawful possession of a weapon N.J.S.A. 2C:39-5(j), (count one); and possession of a weapon by a convicted felon, N.J.S.A. 2C:39-7(b), (count two).

---

[1] Although it is not clear from the record whether this indictment was returned by the same grand jury or by a second grand jury, this uncertainty is legally inconsequential. As our Supreme Court recently reaffirmed, "the grand jury does not conduct 'a mini-trial,' but 'an ex parte inquest' -- it is 'an accusatory and not an adjudicative body.'" State v. Bell, 241 N.J. 552, 559 (2020) (quoting State v. Hogan, 144 N.J. 216, 235 (1996)).

A-1010-17

Defendant was first tried before a petit jury on the charges reflected in Indictment No. 15-11-2648, and was convicted of murder, third degree aggravated assault, and the charges related to unlawful possession and use of a handgun. The jury found him not guilty of second degree endangering the welfare of a child. On June 23, 2017, defendant stood trial on the two charges reflected in the second indictment. The jury found defendant guilty on both counts. The trial judge conducted the sentencing hearing on September 7, 2017.

On the murder conviction, the judge sentenced defendant to a term of life imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[2] The judge imposed a consecutive ten-year term with five years parole ineligibility on the conviction for certain persons not permitted to have a weapon; and a twenty-year concurrent term, with ten years parole ineligibility, on the conviction for unlawful possession of a weapon by a previously convicted felon; and a concurrent term of five years on the conviction for hindering apprehension. Finally, the court merged the possession of a handgun for an unlawful purpose conviction with the

---

[2] In order to calculate the minimum term of parole ineligibility under NERA, a sentence of life imprisonment in this case is deemed to be seventy-five years. N.J.S.A. 2C:43-7.2(a)

murder conviction, and dismissed the counts involving aggravated assault and possession of a controlled dangerous substance.

In this appeal, defendant raises several arguments that allege the judge mistakenly exercised his discretionary authority when he admitted certain evidence at trial that should have been excluded as unduly prejudicial under N.J.R.E. 404(b). Defendant also challenges the aggregate sentence imposed by the judge as unduly excessive and shockingly punitive, and seeks a remand for the court to impose a just sentence. Although defendant is represented by counsel in this appeal, he has nevertheless submitted a pro se supplemental brief that raises a number of arguments attacking the validity of the conviction.

After reviewing the voluminous record developed before the trial court, and mindful of prevailing legal standards of appellate review, we reject defendant's arguments and affirm. The following facts are derived from the evidence presented at trial.

## I.

On May 1, 2015, defendant drove to the residence of Latrena May, located on Tremont Avenue in East Orange. May shared this apartment with her four-year-old daughter, of whom defendant is the father. East Orange Police Officer Kemon Raysan Lee was on routine patrol that night in a marked police vehicle.

Lee testified that at approximately 10:15 p.m., he drove past May's residence and heard a woman's voice scream "officer, officer" approximately four or six times. He activated the police car's overhead lights, made a U-turn, and pulled up in front of May's residence.

As Lee stepped out of the police car and onto the street, he saw May "standing at the top of the stairs to [his] left." He also saw defendant standing "really close to [May] with very little space in between them." According to Lee, defendant and May were standing on the part of the residence that was six steps above the sidewalk, where he was standing. As he approached the stairs, Lee unholstered his service handgun with his right hand, and with his left hand "ordered" May to come down to the sidewalk where he was standing. Defendant fired three shots with his .45 caliber pistol, striking May at pointblank range. Lee returned fire, discharging a total of nine rounds from his .40 caliber service handgun. Defendant was shot a total of four times; all of his bullet wounds were located on the upper side of his legs.

Lee testified that he did not see that defendant had a handgun when he first arrived at the scene in response to May's calls. According to Lee, the first time he realized defendant had a handgun was when defendant shot May. The marked police car Lee drove on the day of the shooting was equipped with a

dash video camera. The video recording from this camera was played to the jury and was used by both defense counsel and the prosecutor to question Lee. Lee provided the following account of his actions after defendant shot May:

> At that time I . . . observed the defendant fall on the floor inside the door with the gun in his right hand and raised up.
>
> . . . .
>
> I moved to the left to get a better shot at him.
>
> Q. And what did you do with your gun?
>
> A. I fired more shots.
>
> Q. Okay. So to be clear, who is it that you saw still holding the gun when you shot between . . .
>
> A. The defendant.

Lee testified that defendant fell on the floor, just inside the door of May's apartment. Defendant thereafter was able to go inside the apartment and close the door.

The State called Joseph Jackson, who resided on the second floor of the same property. Jackson testified that on the day of the shooting he was with a woman named Reshanda Richmond, her son, and one of his friends. Jackson provided the following account of what he witnessed:

6

I was sitting on the couch watching the game and we heard some shots and they sounded real [sic] close so I went to the window and I saw the cops in the front of the house and I was letting them know that there was a family upstairs.

Q. Okay. Prior to hearing the shots, did you hear anything that was happening on the first floor?

A. No.

At this point, the prosecutor provided Jackson with a transcript of a statement he gave to law enforcement investigators on May 2, 2015, the day after the shooting. After Jackson finished reading to himself certain sections of the transcript, the prosecutor resumed his direct examination.

Q. What happened?

A. Well, just before the gunshots, there was a little bit of yelling.

Q. Okay. This yelling, was it a man's voice or a female's voice that was yelling?

A. It was more like a female voice.[3]

Jackson testified that after he was "fully" awake, he heard a female voice coming from the first-floor hallway yelling, "[n]o, stop." He heard gunshots shortly thereafter, and saw a trail of blood from the entrance of the property to

---

[3] Jackson testified that he dozed off watching the basketball game on television and was awoken at approximately ten o'clock at night "by a little bit of yelling."

A-1010-17

the first-floor apartment. The two children who were in Jackson's apartment at the time came running into the room. He told them "to get down" and went to the front of the house to see what had occurred. Jackson testified he looked out from his apartment window and "saw the cop[s] out there and they told me to stay in the window after that because I told them there was a family upstairs."

According to Jackson, when he looked down the building's "outside stairs" that led to the first floor, he saw May's body "at the bottom of the steps." Jackson knew defendant as "the landlord of the building." Jackson testified that at some point during this ordeal, he heard defendant "calling out to Ms. Richmond." Jackson testified that "[c]lose to the end of the situation [May's four-year-old] daughter came upstairs and knocked on the door." This prompted him to apprise the police officers at the scene of the child's presence "so they won't be shooting into the house."

Reshanda Richmond and her son lived in the same apartment with Jackson. She testified that at approximately 10:15 p.m., she heard a "commotion" and heard May yelling. When she walked over to the window, she saw "the police come up and then that's when I heard Mr. Higgs say, '[t]hat's my man,' and then the cops say, I'm not your man,' and I just backed off the window altogether." On further examination, Richmond clarified that she was in her

8

bedroom when she first heard the "commotion" and then heard May saying "[c]all the police," more than once.

Over defense counsel's objection, Richmond testified that she saw defendant and May "arguing." When asked to explain how she reached this conclusion, Richmond responded: "Body language . . . [they were] [i]n front of the door, by the rail." On cross-examination by defense counsel, Richmond corroborated Officer Lee's account of what cause him to immediately turn his patrol car around to respond to May's call.

> Q. Okay. And can you estimate for us[,] I know it was two years ago, but can you estimate for us approximately how long it was seconds, or minutes, whatever term you want to use, whatever measure of time you want to use how long it was from the time that you heard the words "police" till you saw the police car outside the window?
>
> A. It was like immediately as soon as I . . . opened the window, the police was already out there.
>
> Q. Okay. So you heard -- when she yelled, "Police. Police," the police were almost there.
>
> A. Yes.
>
> Q. Okay. And before that you hadn't [sic] hear anything, correct?
>
> A. Correct.

A-1010-17

Juliet Kerr lived on the second floor of the building next to May's apartment. She testified that at approximately 10:00 p.m. on October 1, 2015, she heard "loud talking . . . like somebody was arguing" coming from in front of the house. When she looked out her apartment's window, she saw a police car parked right in front of May's apartment. Kerr explained that from this particular window in her apartment, she can see the entire area of the front part of May's building, including the steps and brown entrance door.

Kerr testified she saw a woman in the doorway of the building wearing "[j]ust her underwear and a bra." There was an argument coming from inside somewhere by the brown door. Kerr saw May say something to the police officer as the officer walked toward May and defendant.

> Q. Okay. And what happened as the cop was walking towards them?
>
> A. She was saying something to him, the cop.
>
>      . . . .
>
> The cop was kind of turning around slowly, you know, and I was like . . . okay, the cop is there, everything is fine.
>
>      . . . .
>
> Q. Okay. What happened next?

A. As soon as he was -- she said something like -- she said a name. I can't remember the name.

. . . .

But she said, stop.

Q. Okay. The female in the underwear said stop?

A. The female in the underwear said stop.

Q. And what happened next?

. . . .

A. I heard a loud bang (indiscernible), you know. And I got scared because I thought when I heard, I know it was a gunshot. But then I heard a bang. I saw smoke coming where the person was standing. When I heard the bang . . .

. . . .

I saw the smoke. I heard boom. And I look, and I saw the person on the ground.

The person laying on the ground bleeding profusely was May, whom defendant had fatally shot three times with a .45 caliber handgun while standing less than three feet away from her. Emergency medical personnel responded to the scene. However, because the location where May's body fell remained an active crime scene, the commanding officer concluded it was not safe to permit

11

the medical team to attend to her wounds. Joseph Householder, one of the paramedics who responded to the scene, testified as follows:

> We initially made contact on scene and we ended up staging for approximately, if I recall, like 45 minutes, around there, until we were told that the scene was secure.
>
> At that point, we went to the female patient, who was lying outside on the ground to assess her and found her to be without any signs of life. At that point . . . we performed a pronouncement time of death for her.

East Orange Police Captain Berkely Jest of arrived at the scene shortly after the shooting and assumed command of the situation. Defendant was wounded when Officer Lee returned fire after defendant shot May. However, he was inside the building and remained armed with the same .45 caliber handgun he used to kill May. With this in mind, Jest first attempted to deescalate the situation by persuading defendant to surrender himself. After this approach failed, Jest ordered the officers to execute a tactical entry into the property. Upon entry, the officers found defendant lying in the hallway of the first floor, bleeding from the bullet wounds in his lower extremities. Defendant was then taken into custody and treated at the scene by the emergency medical staff.

Michael Recktenwald of the Essex County Prosecutor's Office's Internal Affairs Bureau, was the lead investigator in this case and testified as a defense

12

witness. Recktenwald determined that Officer Lee acted properly and in a justifiable manner when he fired his weapon in response to defendant's illegal use of deadly force. The New Jersey Attorney General agreed with the Essex County Prosecutor's Office findings and conclusions. In his statement to the investigators, Lee did not mention at what point in his interaction with defendant he withdrew his service weapon from its holster. Recktenwald agreed with defense counsel's characterization that Lee "seemed surprised" when he saw the videorecording from his dash camera that showed he was holding his service handgun in his hand when he exited the car.

Dr. Li Wang, the North Regional Medical Examiner, performed the autopsy on May's body. By stipulation from defense counsel, the trial judge admitted Dr. Wang as an expert witness in the field of forensic pathology. Dr. Wang confirmed Officer Lee's observation that May's first wound was the result of gunshot fired "within 18 to 24 inches" from her body. The trajectory of this one bullet was sufficient to cause a fatal injury. Dr. Wang explained that the projectile perforated the aorta, the largest artery in the human body, continued through both lungs, exited at the right side of her chest, and reentered the right upper arm, fracturing the right side of the humerus, the bone between the shoulder and elbow.

A-1010-17

Dr. Wang opined that the second gunshot wound was also fatal because the bullet went through May's liver, spleen, and abdominal wall. Based on his forensic examination and experience, Dr. Wang opined the second bullet was fired from a distance of "about 18 to 24 inch[es], but probably a little bit further away compared to the first injury." The third gunshot wound perforated the left side of her abdomen and lacerated the upper part of the left kidney. The bullet crossed the midline of the body traveling below the skin surface.

Defendant testified in his own defense. He described himself as a self-employed property manager and investor. When asked by his attorney to clarify what he meant by "investments," defendant stated:

> I purchase properties, I fix them, I sell them, I purchase properties, I fix them and I keep selling them for investment purposes.
>
> Q. And where -- what general geographic vicinity are these properties in?
>
> A. Basically, Newark, East Orange. I had properties in Jersey City at one point in time. Normally, they're outside of the urban areas.

Defendant met May in 2007, when she was visiting an apartment her sister rented in one of defendant's properties. Defendant first characterized his relationship with May as "friendly." It thereafter evolved into a "dating relationship" and eventually a "sexual relationship." He described May as an

14

educated woman with a master's degree education. At the same time defendant was cultivating this relationship with May, he was involved in a long-term relationship with a woman named Oneida Tretola, with whom he had three biological children. At the time this case went to trial in 2017, defendant referred to Tretola as his "fiancée," with whom he had had a romantic relationship for "approximately [twenty] years." Furthermore, as defense counsel made clear:

> Q. Now, while you -- you knew Latrena [May] obviously up through 2015, correct?
>
> A. Yes, I did.
>
> Q. Now, this was during a time when you were still, as you are today, still in a relationship with Oneida [Tretola]. Is that true?
>
> A. Yes, it's true.

Defendant testified that May and their daughter began living in the apartment ten months before the shooting occurred on May 1, 2015, meaning May moved in on or around August 1, 2014. The property is a two-family dwelling; May occupied the first-floor apartment. Defense counsel eventually questioned defendant about an incident that occurred on March 25, 2015, thirty-seven days before the shooting. Defendant claimed that on the evening of March 25, 2015, "me and Latrena [May] was going back and forth about me basically

15

being with her and me leaving Oneida [Tretola]. And I wasn't doing that."
Defendant claimed that May became "upset."

> Q. And when she became upset, what did you do?
>
> A. You know, after, you know, she did what she did, I grabbed her by shoulders. I told her, I said, Latrena, you need to stop, calm down, you always taking things a little too far.
>
> Q. Okay. Now, getting back to -- now, did you ever at any time choke her on that day?
>
> A. No, I didn't choke her. Not at all. I never choked Latrena. Never.

Against this backdrop, defense counsel asked defendant to describe the events that led to May's death on May 1, 2015. According to defendant, May called him in the afternoon of May 1, 2015 and told him to bring money for their daughter. She also wanted to discuss the status of their relationship. Defendant testified he arrived at the Tremont Avenue apartment at approximately 10:00 p.m. May was sitting up in bed in her bedroom watching television. He gave her $350 to cover some child expenses.

At this point, May asked defendant if he was staying. Defendant testified he told her he was not staying. This prompted an angry response from May in which she accused him of not caring for her or their child. Defendant claimed that he made clear to May that he was never going to leave Oneida [Tretola].

16

He also expected her to move out of the apartment at the end of the lease.[4]

According to defendant, she became "very belligerent" and told him he was "going to cause her to do something to me."

> Q. Okay. And did you understand what that meant?
>
> A. Well, I took it as [an] idle threat. I took it as she was just upset. She was mad and voicing her opinion. But –
>
> Q. And what happened after she made that statement?
>
> A. She pulled her gun out from under her pillow.
>
> Q. From under the pillow?
>
> A. Yes.
>
> Q. Okay. And now, had you ever seen this gun before?
>
> A. Yes, I had.
>
> Q. On how many occasions?
>
> A. Actually, that was actually my third time visually seeing that gun.[5]

---

[4] The appellate record does not include a copy of the lease.

[5] Defendant testified that the first time he saw this particular handgun was "before she moved to Scotch Plains;" the second time was when May moved into the apartment on Tremont Avenue "towards the middle or the end of July" 2014. He denied having a handgun in his possession on May 1, 2015.

17

Defendant testified he told May he was leaving and walked out of the bedroom. May followed him out from the bedroom wearing only "panties and halter." In response to defense counsel's questions,[6] defendant testified that May continued to follow him onto the front porch, which defendant described as being "four-feet-three-inches wide . . . at the railings" and "roughly three and a half feet" front-to-back. He testified that he "grabbed the weapon out of her hand" as soon as she stepped out onto the porch, not out fear, but because he deemed it "a bit extreme."

> Q. Now, when you . . . say you snatched it out of her hand. What happened after that?
>
> A. Well, I started scolding her. I started telling her like, is you crazy, I mean, you out here in your panties, first of all, second of all, you got this gun in your hand, you're risking your career. I used to tell her when she want to fight with Oneida, like, you got too much to lose, you know, you should think before you do things, or stuff ain't that serious for you to be taking it over the top like you take it over the top. I mean, I did everything I was supposed to done [sic] for her.
>
> Q. Now, what was your intention? What were you going to do with that gun now that it was in your hand? What was your intention?

---

[6]  Before reaching this part of his testimony, defense counsel preemptively questioned defendant about his prior criminal convictions in accordance with N.J.R.E. 609.

A-1010-17

A.  . . . I never even intended to have the gun in my hand, first of all.  Right then and there, I was more or less trying to tell her about herself.  That was my first thoughts.

Q. What's the next thing that happened while you were on the porch?

A. Officer Lee had turned the corner. I know him now as Officer Lee. But the police car came around the corner. I didn't even notice the police car coming around the corner.

Q. <u>How was your attention brought to the police car</u>?

A. <u>Because as the police car was driving past us, Latrena was like, police, police</u>.

Q. And who was she saying that to?

A. She was alerting me that the police was right there.

Q. Okay. And did you see her signal in any way to the police officer?

A. She never signaled that -- she never signaled that cop.  Never once.

Q Now, . . . when she told you . . . brought your attention to the fact that there was a police car on the block, did you look to see the police car?

A.  It was probably my biggest mistake . . . I started watching the cop.

[(Emphasis added).]

According to defendant, May wanted to go back in the house as soon as Officer Lee made a U-turn and activated the overhead lights of his patrol car. As the police car stopped in front of the residence, defense counsel asked defendant: "what are your thoughts as to what was going to happen?" Defendant responded: "I was like, I got a gun in my hand, you got me in this situation . . . them was [sic] my initial thoughts." Defendant also stated he was trying "to block" May so the officer "wouldn't see how she was outside because I know that would have made him stop."

Defendant provided the following account of his interactions with Officer Lee while allegedly standing in front of May to conceal her state of undress:

> Q. Okay. Now . . . at some point you see Officer Lee exit his car, correct?
>
> A. Yes, I do.
>
> Q. And was he holding anything in his hand?
>
> A. He was reaching for his gun the minute he was trying to get out of the car. I mean, he was basically grabbing his gun before he was out of the seat. Porch and the car, it's like from the porch to the street, six steps, let's say a foot each step. To the sidewalk, three foot. Another two and a half foot right there with the curb -- I mean, with the grass part, the little curb. Six –
>
> Q. Six, three, two . . . and a half feet?

A-1010-17

A. We only about 11 feet to the initial car from where we was actually at.  So the proximity is very close.  We . . . wasn't away from each other.  We . . . was very close . . . .

At defense counsel's request, defendant stepped down from the witness stand to respond to questions related to what is depicted in the videorecording taken by the patrol car's dash camera.

Q. Okay. Now, we just saw Officer Lee walk past the front of his patrol car, correct?

A. Yes.

. . . .

A. When -- well, the conversation was basically Officer Lee replying to me as Officer Lee is hitting the steps.  I mean, the sidewalk.  The sidewalk part.

Q. Okay. Before we get to that, did Officer Lee say anything to Ms. May at any time once he exited his patrol vehicle?

A. He never said nothing. Latrena and Officer Lee never had two words with each other besides her yelling to him, stop.

Defendant testified he made the first attempt to speak with Officer Lee.

When I saw him hopping out the car and reaching for his weapon, I yelled to him, I said, my man, you ain't going to believe this.  By that time, Officer Lee was around the front of his car.

. . . .

21

> Well, patrol car is here. Patrol car is here. Officer Lee exited the patrol car. He's coming around. <u>The minute he got out, I'm yelling to him, my man, you ain't going to believe this.</u> By then, Officer Lee's in front of his car. He said, I'm not your M-ing F-ing man, come down here.
>
> [I] was trying to alert him that I had a weapon in my hand.
>
> [(Emphasis added).]

Defendant testified that Officer Lee did not respond positively to his advances. The Officer just repeated his command to defendant to "come the F down." However, instead of heeding Officer Lee's command, defendant "spun around and I said, I got a gun." Defense counsel provided for the record the following description of defendant's posture:

> For the record, Mr. Higgs is standing up -- standing with his arms out to his sides with his hands upraised, his elbows about a foot below his shoulders with his forearms and fingers pointing up, for the record.

Although he was holding the handgun when he faced Officer Lee, defendant testified that he was pointing the weapon "straight up." Defendant characterized this alleged gesture on his part as "[a] surrendering position." According to defendant, Officer Lee responded by firing his service weapon without any further verbal comment or command.

22

Q. What happened next?

A. When I heard the shot, I tried pushing Latrena [May] out of the way. From there . . . everything just went crazy. It went -- I went black.

Q. Okay . . . [w]hat did you experience, to the best of your recollection?

A. Felt like I was being beat with a sledgehammer . . . .

Defendant testified that he was struck four times by shots fired by Officer Lee. In response to his attorney's questions, defendant pointed to where he was shot. Defense counsel verbally described for the record the locations indicated by defendant: one bullet struck his mid-thigh in the front of his left leg; two bullets struck the upper right side of his thigh; and one bullet struck the lower right side of his thigh.[7]

Defendant testified that when Officer Lee began to shoot, he fell back on his buttocks to the porch. He thereafter pushed or slid back with his hands, maneuvering his body to get into the foyer of the building, still holding the gun in his hand. Despite being in severe pain, defendant claimed he maneuvered

---

[7] Defendant testified that the physicians who treated him at the hospital after the shooting told him one of the bullets severed the femoral artery in his left leg. "They said they didn't know how I survived because I supposed to bled [sic] out." This prompted an objection from the prosecutor, which the trial judge sustained.

A-1010-17

himself "back into the foyer . . . [as his] mind [was] just screaming with pain," and "tossed the gun over towards the supplies." Despite the uncontested medical evidence showing May was shot three times at close range with the .45 caliber handgun held by defendant throughout this event, defendant testified that he had no recollection of ever firing the gun.

Defendant pushed himself on the floor until he reached his four-year-old daughter's bedroom. The child was asleep. He testified that he woke her up; told her to put on her shoes and go to the upstairs apartment where Reshanda Richmond resided. Defendant testified that he yelled to Richmond to come and get the child.

II.

Against this factual record, defendant raises the following arguments.

POINT I

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ADMITTING INTO EVIDENCE AN ALLEGED PRIOR INCIDENT WHERE DEFENDANT PUT HIS HANDS AROUND DECEDENT'S NECK AND CHOKED HER.

POINT II

THE STATE COMPOUNDED THE ERROR IN ADMITTING THE N.J.R.E. 404(b) TESTIMONY BY ITS IMPROPER USE AND SPURIOUS ARGUMENTS (Not Raised Below).

A-1010-17

POINT III

DEFENDANT'S RIGHT TO A FAIR TRIAL WAS COMPROMISED WHEN THE COURT PERMITTED A LAW ENFORCEMENT OFFICER TO USURP THE FUNCTION OF THE JURY BY OFFERING HIS OPINION THAT VIDEO FOOTAGE DEPICTED DEFENDANT WITH A GUN IN HIS WAISTBAND.

POINT IV

ADMISSION INTO EVIDENCE OF NUMEROUS GRUESOME, IRRELEVANT AUTOPSY AND CRIME SCENE EXHIBITS PREJUDICED THE JURY AND DENIED DEFENDANT HIS RIGHT TO A FAIR TRIAL.

POINT V

ALLOWING THE STATE TO IMPEACH DEFENDANT WITH HIS REMOTE CONVICTIONS CONSTITUTED AN ABUSE OF DISCRETION AND DENIED HIM A FAIR TRIAL.

POINT VI

DEFENDANT'S RIGHT OF CONFRONTATION WAS IMPROPERLY LIMITED WHEN THE TRIAL COURT SHIELDED OFFICER LEE FROM BEING CROSS-EXAMINED ON HIS PRIOR POLICE SHOOTINGS AND SUBSEQUENT INTERNAL AFFAIRS INVESTIGATIONS.

A. Defendant Was Denied Access To Discoverable Material Relevant To Officer Lee's Inherent Bias, Interest And Motive.

25

B.    Defendant Should Have Been Permitted To Cross-Examine Officer Lee About His Prior Shootings to Expose Any Bias, Interest Or Motive As Well As To Explain His Actions On May 1, 2015.

POINT VII

DEFENDANT IS ENTITLED TO A RESENTENCING BECAUSE THE TRIAL JUDGE FAILED TO FOLLOW HE REQUIREMENTS OF THE CODE OF CRIMINAL JUSTICE IN IMOSING SENTENCE.

A.    The Trial Judge Failed To Properly Identify And Assign Weight To Aggravating Factors.

B.    The Trial Judge Failed To Find Appropriate Mitigating Factors.

C.    The Trial Judge Improperly Found That The Sentence On Count 2 Of Ind. 15-11-2650 Must Be Served Consecutively.

Appellant raises the following arguments in a pro se supplemental brief:

POINT I

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ADMITTING INTO EVIDENCE AN ALLEGED PRIOR INCIDENT WHERE DEFENDANT PUT HIS HANDS AROUND DECEDENT'S NECK AND CHOKED HER.

POINT II

TRIAL COURT ALLOWED THE STATE TO INTRODUCE AN APPLICATION FOR CHILD

26                                                    A-1010-17

SUPPORT IN REBUTTAL TO IMPEACH DEFENDANT'S CREDIBILITY CONSTITUTED AN ABUSE OF DISCRETION.

POINT III

TRIAL COURT ABUSED ITS DISCRETION ALLOWING THE STATE TO PLAY ALL OF A POLICE DISPATCH RECORDING MARKED S-79A OVER DEFENSE'S CONTINUED OBJECTION.

POINT IV

THE TRIAL COURT ERRED IN RULING THAT THE WARRANTLESS SEARCH OF THE HALLWAY OF 164 TREMONT AVENUE WAS VALID.

POINT V

PROSECUTOR'S IMPROPER ARGUMENT SUPPORTED BY DETECTIVE GREEN'S INADMISSIBLE TESTIMONY THAT THE OBJECT DEPICTED IN S-30 IS DEFENDANT WITH A GUN CONSTITUTES REVERSIBLE ERROR.

POINT VI

PROSECUTOR'S UNCORRECTED MISSTATEMENT OF LAW COMPARING AN INVOLUNTARY ACT WITH AN ACCIDENT "AN [     ]" AS STATED TO THE JURY CONSTITUTES REVERSIBLE ERROR.

POINT VII

THE CUMULATIVE EFFECT OF THE ERRORS RAISED IN DEFENSE COUNSEL'S ORIGINAL BRIEF, AS WELL AS THE PREVIOUS POINTS IN

27

THIS SUPPLEMENTAL BRIEF, WARRANTS REVERSAL OF THE CONVICTION.

A

The evidence that established the cause of May's death is substantially undisputed. The testimony of Dr. Wang, the Medical Examiner, established that the first .45 caliber bullet that struck May's body perforated her liver, spleen, and abdominal wall. This single bullet was therefore sufficient to cause the massive fatal injuries that led to her death. Despite defendant's testimony denying any responsibility, there is overwhelming evidence to support the jury's verdict that he shot and killed May.

Defendant nevertheless argues in Point I that the trial court committed reversible error and abused its discretion when it granted the State's motion to present evidence under N.J.R.E. 404(b) of a prior incident of domestic violence perpetrated by defendant against May. The State offered this evidence to rebut defendant's claim that he shot May involuntarily. Defendant argues the court erred because defendant did not raise a state of mind or an accidental shooting defense.

We disagree with defendant's argument and affirm. Essex County Prosecutor's Office Detective Kevin Green was the on-call homicide detective on May 1, 2015. He arrived at the scene of the shooting at approximately 11:30

p.m. and observed blood droppings that led up to the front door, and blood spatter on the door itself. A trail of blood also led from the foyer to the first-floor apartment. Once inside the apartment, Greene noticed "a lot of blood" leading into what looked like a little girl's room.

At the suppression hearing, Green testified that the search of the apartment took place one to two hours after the shooting. He did not consult with the on-call prosecutor before searching the area without first securing a warrant. He testified that he proceeded in this fashion because the property, including the apartment, was a crime scene where a homicide had just occurred. Green concluded the situation established "exigent" circumstances because the handgun used in the shooting had not been located. He stated: "There's . . . [s]till one kid upstairs along with two adults. There were people in the home with a missing gun. That's very exigent."

Detective Michael Mossa testified that he and the other officers who took part in the search conducted a walk-through of the crime scene to identify items considered to be of evidentiary value. Mossa helped move a bag of rock salt that was in the hallway, and discovered a .45 caliber semi-automatic handgun. The weapon was not loaded. Green admitted that the handgun was not found in

A-1010-17

plain view. He added, however, that: "They entered the foyer. They were looking at ballistic evidence in the foyer and . . . discovered the gun."

The judge denied defendant's motion to suppress the handgun. As a threshold issue, the judge found no basis to conclude the warrantless search was permissible under exigent circumstances:

> [T]he . . . Crime Scene [Unit] . . . got there at about 11:30 at night, and at that time [defendant] had already been removed from the residence and taken to the hospital approximately a half hour before the officers started to do their investigation. And so . . . the exigency really is no longer there, because [defendant] is no longer there.

The judge held, however, that defendant did not have a reasonable expectation of privacy in the common area of a two-family dwelling. The judge found that, as the owner of the building, while defendant had certain rights to inspect common areas of the property, "he does not have any reasonable expectation of privacy . . . in a particular tenant[']s apartment or in this case in the common hallway."

The motion judge also relied on the doctrine of inevitable discovery in denying the motion to suppress:

> [The] Crime Scene [unit] . . . [is] obviously required to . . . go through the crime scene methodically, retrieve all the evidence that there may be, [and] photograph everything they believe is to be [sic] relevant material

to preserve it. And ultimately they would have and they did . . . locate the . . . weapon.

So . . . it would have been found regardless. But since you have no expectation of privacy, as I indicated, the evidence . . . will not be suppressed.

When we review a trial court's decision to grant or deny a motion to suppress, we are bound to defer to the trial court's factual findings that are supported by sufficient credible evidence in the record. In Re J.A., 233 N.J. 432, 445 (2016). However, we review de novo the trial court's legal conclusions. Ibid.

The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of our State Constitution require police officers to "obtain a warrant before conducting a search, unless the search falls into a recognized exception to the warrant requirement." State v. Sencion, 454 N.J. Super. 25, 32 (App. Div. 2018). However, our Supreme Court has expressed "a clear preference for police officers to secure a warrant before entering and searching a home." State v. Wright, 221 N.J. 456, 468 (2015) (quoting State v. Brown, 216 N.J. 508, 527 (2014)). Thus, where it is practical to do so, law enforcement agents are generally required to secure a warrant before conducting a search because, in most cases, warrantless searches of private dwellings are presumptively invalid. State v. Lamb, 218 N.J. 300, 315 (2014).

31

It is well-settled that a defendant challenging a warrantless search must first establish that he or she has a reasonable expectation of privacy in the searched location. State v. Hinton, 216 N.J. 211, 228 (2013). In a multi-occupancy premises, "none of the occupants can have a reasonable expectation of privacy in areas that are also used by other occupants." State v. Penalber, 386 N.J. Super. 1, 10 (App. Div. 2006) (quoting State v. Johnson, 171 N.J. 192, 209 (2002)). Defendant did not reside in this two-family property. The motion judge correctly held that he did not have a reasonable expectation of privacy in the hallway of this property.

In the interest of clarity, we also hold the search was valid under the emergency aid doctrine. The following material facts are not disputed. The police officers searched the building nearly one-and-a-half hours after the shooting. By that time, defendant had been removed from the scene. There were thus no exigent circumstances. There is no broad "murder scene" exception to the warrant requirement, Mincey v. Arizona, 437 U.S. 385, 392-95 (1978); State v. O'Donnell, 203 N.J. 160, 162 (2010). However, an exception exists when the police search the premises only for other crime victims or criminals. Mincey, 437 U.S. at 393. Under these circumstances, the police may seize any evidence in plain view. Ibid. Here, we must determine whether, after

responding to an emergency call and lawfully entering a homicide scene, a later re-entry by the police into a police-secured location, followed by the plain view seizure of evidence, constitutes merely a continuation of the initial emergency entry.  O'Donnell, 203 N.J. at 162.

The emergency aid doctrine requires the law enforcement official to have an objectively reasonable belief, even if later found to be erroneous, that an emergency demands immediate assistance in order to protect or preserve human life, or to prevent serious injury.  The provision of assistance must be the prime motivating factor of the law enforcement agent's decision to conduct a warrantless entry; and any search must be limited to those places that have a nexus to the emergency.  Id. at 163.  In addition, the reasonableness of continuous police presence at the location initially accessed under the emergency aid exception is determined by the facts presented.  Ibid.

The officers were concerned for the safety of the four-year-old child.  The police did not know the child's whereabouts in the house.  The firearm used in the shooting had not been recovered.  The police had a reasonable basis to believe the handgun was somewhere in the house since that is where defendant was apprehended.  Under these facts, the emergency aid doctrine applies.

A-1010-17

Courts permit warrantless searches when police officers act "not in their law enforcement or criminal investigatory role, but rather in a community caretaking function." State v. Bogan, 200 N.J. 61, 73 (2009). That doctrine recognizes that police officers provide a wide range of functions outside their traditional law enforcement and criminal investigatory roles. State v. Edmonds, 211 N.J. 117, 141 (2012). These activities include protecting the vulnerable from harm where an immediate search is required to preserve life or property. Ibid.

In Bogan, the Court rejected the view that police can never engage in community caretaking activities merely because they are also involved in the detection, investigation, or acquisition of evidence. 200 N.J. at 77. This is particularly true where a police officer could prevent imminent harm to a child. Ibid. "It is well-recognized that leaving children unattended may constitute a significant threat to their safety and welfare." Id. at 76.

Here, the child's whereabouts were unknown. The weapon used in the shooting had not been recovered and was believed to be in the house. These facts created an unacceptable risk of danger to the child as well as to the residents of the building in general. The fact that any of one of them may inadvertently obtain access to this firearm is a significant factor that justifies

law enforcement agents to enter private property in the performance of their community caretaking function. State v. Navarro, 310 N.J. Super. 104, 109 (App. Div. 1998).

B

Defendant also argues the trial court abused its discretion by admitting evidence of a prior incident in which he allegedly choked May. The State sought to admit this evidence to rebut defendant's claim that he did not intend to shoot May. Defendant alleges he did not raise the state of mind defense nor claimed he may have accidentally shot May. In fact, defendant maintained at trial that his finger may have pulled the trigger involuntarily, after he was shot by Officer Lee.

This argument is not supported by the facts presented to the jury, including defendant's own testimony. The trial judge properly exercised his discretion to admit this evidence under N.J.R.E. 404(b) to support an absence of mistake, negate accidental behavior, and show motive and intent. N.J.R.E. 404(b) provides:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of

mistake or accident when such matters are relevant to a material issue in dispute.

This type of evidence is admissible if the State can satisfy the following four requirements: (1) the evidence must be "relevant to a material issue" in the case; (2) the evidence must be "similar in kind and reasonably close in time to the offense charged;" (3) the evidence must be established under the clear and convincing burden of proof; and (4) the probative value of the evidence is not outweighed by its prejudicial effect. State v. Cofield, 127 N.J. 328, 338 (1992).

The trial judge conducted an N.J.R.E. 104(a) hearing to determine the admissibility of N.J.R.E. 404(b) evidence. The State presented the testimony of Eugene Spamn, a dispatcher for the East Orange Police Department. Spamn testified that at 10:22 p.m. on March 25, 2015, he received a 9-1-1 call from an individual residing in Apartment No. 1 at the property at issue here. Spamn dispatched a police patrol car to that location.

East Orange Police Officer Steven Plumer reported to the scene and was let into the first-floor apartment. May and her infant daughter were the only persons in the apartment. May informed Officer Plumer that her baby's father had assaulted her. May told Plumer that defendant started choking her on the living room couch and "at some point ended up in the kitchen on the floor, he was choking her again." Plumer described May as "almost in hysterics, very

36

disheveled." Her face was puffy, her eyes were watery, and she had bruises on her neck. Plumer also noted that the living room and the kitchen were "disheveled."

May told Plumer that she wanted to document the incident because she feared defendant was going to "come back and kill her." May claimed that defendant had accused her of sleeping with other men. Defendant was issued a summons and the police wrote a domestic violence report. Officer Plumer did not make a written report of the incident nor take photographs to document May's injury to her neck.

In a memorandum of opinion, the judge applied the Cofield factors and found the incident was relevant to defendant's state of mind on the night of the shooting. The judge wrote: "When a defendant concedes involvement in a shooting but contests his state of mind at the time of the offense, state of mind becomes a relevant issue." The judge found this evidence was relevant to prove motive, specifically, defendant's jealousy over May's alleged relationship with another man.

The judge also found the evidence satisfied the second Cofield factor because the choking incident was sufficiently similar in kind and reasonably close in time to the shooting incident five weeks later. "The similarities consist

of (1) the same parties; (2) the same location; (3) time of evening; and (4) the incidents being only five weeks apart."  As to the third prong, the judge found the State had proven the incident by clear and convincing evidence.  The judge noted the audio recording of the 9-1-1 call, the testimonies of the dispatcher and Officer Plumer.

The judge did not find the 9-1-1 call violated the Fifth Amendment's Confrontation Clause.  The judge gave the call "considerable weight" and found "the objective circumstances indicate that the victim's primary purpose . . . in placing the call was to enable police assistance for an ongoing emergency."  The judge found Officer Plumer's testimony "very credible."  Through this evidence, the State established by clear and convincing evidence the admissibility of the March 25, 2015 incident.

As to the fourth prong, the judge found the evidence's probative value was not outweighed by its prejudicial effect.  "[B]ecause Defendant raised his state of mind as an issue, the State is permitted broad latitude to introduce motive or intent evidence . . . ."  The judge found there was a lack of probative evidence related to defendant's state of mind during the shooting that weighed strongly in favor of admitting evidence of the March 25, 2015 incident.

A-1010-17

Defendant testified at trial about the March 25, 2015 incident. He characterized the incident as an argument he had with May about her demands for him to leave Tretola. He claimed May was the aggressor when she grabbed and bit him. He admitted he grabbed her but denied choking her. This prompted the State to call Officer Plumer as a rebuttal witness.

The admission or exclusion of evidence at trial rests in the trial court's sound discretion and will be reversed only for an abuse of that discretion. State v. J.M., 225 N.J. 146, 157 (2016). Defendant claims his actions were involuntary; he pulled the trigger of the .45 caliber handgun only after Officer Lee shot him. The State has the right to challenge defendant's state of mind defense under N.J.S.A. 2C:2-1(a). See State v. M.L., 253 N.J. Super. 13, 22 (App. Div. 1991).

In State v. Nance, 148 N.J. 376, 380 (1997), the defendant admitted to the shooting that led to the death of the victim, a male friend of a woman with whom the defendant had had a relationship. The defendant claimed that it was accidental. To rebut this defense and satisfy its burden of proof that the killing was intentional, the State sought to introduce evidence of bad acts the defendant had committed against the woman out of jealousy. Id. at 382. These bad acts included an incident where the defendant tore up roses that had been delivered

to the woman and a confrontation between the defendant and one of the woman's brothers. Id. at 382-84.

The Supreme Court held that the woman's testimony on these incidents established that the defendant's jealousy was relevant to the issues of motive, intent and lack of accident. Id. at 388-89.

> The State charged defendant with knowing or purposeful murder; therefore, the State had to negate the claim of an accident or self-defense to establish that crime. There was no other evidence available through which the State could establish motive because, while defendant conceded his involvement in the shooting, he claimed that it was accidental . . . . Thus, defendant's state of mind was a relevant issue, and the motive of jealousy was a proper basis upon which the jury could conclude that defendant did or did not intend to shoot the victim.
>
> [Id. at 388.]

As in Nance, defendant here conceded his involvement in the shooting, but claimed he did so without the purposeful or knowing mental state required to be guilty of murder under N.J.S.A. 2C:11-3(a)(1) and (2). Consistent with Nance, the State here has no other evidence available to rebut that defense. The March 2015 incident served to negate defendant's claim of accident.

Defendant points to State v. Sanders, where the defendant, charged in the death of his infant daughter, claimed that he hit the child while "play-boxing"

with her. 320 N.J. Super. 574, 577 (App. Div. 1999). The State sought to introduce evidence that the defendant had been violent towards the child's mother on several occasions. Id. at 578-79. This court reversed the trial court and held that the evidence was inadmissible under N.J.R.E. 404(b). Id. at 580-84. We concluded the evidence was not relevant to prove that the defendant knowingly and purposely killed his daughter. Id. at 581. "There is simply no logical connection between the evidence that defendant assaulted his paramour and the fact in issue." Ibid. (internal quotations omitted). Rather, the evidence was an effort to show that the defendant had the requisite intent because he had an "assaultive disposition." Id. at 582, 584.

The analysis we adopted in Sanders is not applicable to the present matter. The evidence the State introduced here involved the victim of the charged crime. Thus, unlike in Sanders, the evidence in this case is relevant to the question of motive and intent and rebuts the claims mistake or accident. Stated differently, this evidence was not introduced to show that defendant had a predisposition to violence.

## C

Defendant also argues that the prosecutor's summation compounded the purported prejudice caused by the trial court's decision to admit N.J.R.E. 404(b)

A-1010-17

evidence. We disagree. The prosecutor made the following comments during

his summation:

> The [c]ourt gave an instruction about a prior incident
> between Latrena May and [defendant] on March 25th,
> 2015. For state-of-mind purposes, you're allowed to
> consider a prior incident between [defendant and May],
> where he came to her house, he choked her, and he
> threw her to the ground. That intent, to assault her and
> commit harm on her, you can consider when
> determining did [defendant] purposely or intentionally
> cause harm on Latrena May.

At this point, the prosecutor played the audio recording of the 9-1-1 call

May made to the East Orange Police Department on March 25, 2015. The

prosecutor then resumed his summation:

> There's your intent, ladies and gentlemen. They argue
> this was an accident and this is an "oops." What is it,
> fool me once shame on you, fool me twice shame on
> me? <u>This happened twice</u>. Actually, three shots. I
> would say something happened to her three times.
>
> The point I'm trying to make here, ladies and
> gentlemen, is you can't hide behind, it was an accident,
> it was involuntary, when five weeks earlier you went to
> her house, the same location which, by the way, you
> heard this was at 10:22 p.m. on March 25th, 2015. May
> 1st was 10:15 p.m. Interesting, right?
>
> [(Emphasis added).]

Defense counsel did not object to any part of the prosecutor's summation.

We therefore must review this issue under the plain error standard codified in

42

Rule 2:10-2, which states that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." This Rule also authorizes this court, in the interests of justice, to "notice plain error <u>not brought to the attention of the trial or appellate court</u>." (Emphasis added).

The court gave the jury the following instructions to guide them in how they should consider this evidence:

> Now, evidence has been introduced at trial that Andre Higgs went to Latrena May's residence on March 25th, 2015 and allegedly put his hands around her neck and choked her. Normally, such evidence is not permitted under our Rules of Evidence. Our rules specifically exclude evidence that a defendant has committed other crimes, wrongs or acts when it is offered only to show that he has a disposition or tendency to do wrong and, therefore, must be guilty of the charged offenses.
>
> However, our rules do permit evidence of other crimes, wrongs or acts when the evidence is used for certain specific narrow purposes. And in this case, the fact that [defendant] allegedly put his hands around Latrena May's neck and choked her is being offered by the State for the sole purpose of refuting . . . defendant's defense theory that [he] involuntarily shot Latrena May three times after or while [he] was shot by Police Officer Lee.
>
> Whether this evidence rebuts . . . that [defendant] involuntarily shot Latrena May is for you to decide. You may decide that the evidence does not refute or rebut that [defendant] involuntarily shot Latrena May and is not helpful to you at all. In that case, you must

43

disregard the evidence. On the other hand, you may decide that the evidence does refute or rebut the defense theory that [defendant] involuntarily shot Latrena May and use it for that specific purpose.

However, I remind you that you may not use this evidence to decide that [defendant] has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because the defendant had committed other crimes, wrongs or acts he must be guilty of the present crimes. I have admitted the evidence only to help you decide the specific question of whether [defendant] involuntarily shot Latrena May.

[(Emphasis added).]

The trial judge's instructions provided the jurors proper guidance on how to evaluate this evidence. This evidence directly rebuts defendant's claim that any shooting attributable to him was purely accidental. Defendant testified that he was always candid with May concerning the nature of their relationship. Despite having fathered a child with May, defendant claimed he told her that he would never end his relationship with Oneida Tretola. However, defendant testified that the argument which resulted in May's death was rooted in her unwillingness to continue to accept this second-class arrangement. The jurors were required to consider this evidence and determine what drove May to leave her four-year-old daughter asleep in her bed, and step outside the front porch of

her home with defendant, without shoes and wearing only panties and a brassiere.

Defendant argues the prosecutor's summation remarks exceeded the permissible bounds of fair commentary on the evidence and the judge's jury instructions on N.J.R.E. 404(b) evidence were inadequate to counteract this prejudice. Mindful of the standard of review in Rule 2:10-2, we discern no legal basis to conclude the prosecutor's summation were clearly capable of producing an unjust result and consequently denied defendant of his right to a fair trial.

The remaining arguments in the brief written by defendant's appellate counsel and the arguments defendant raised in his pro se supplemental brief are clearly without merit and do not warrant further discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1010-17